JOSEPH A. GUTHRIE, Administrator of DAVID B. WHIMSTER, v. CONWAY F. HOLMES, Appellant.

### In Banc, November 17, 1917.

1. PRINCIPAL AND AGENT: Negligence of Automobile Driver: Liability of Owner: Presumption. In a suit for damages against the owner of an automobile, for personal injuries due to the negligent driving of the car by the chauffeur, in the absence of the owner, proof that the automobile was owned by the defendant and that the chauffeur was in his general employment raises a presumption that the chauffeur at the time was acting within the scope of his employment and makes a prima-facie case against the owner resting on the presumption. But such presumption takes flight upon the appearance of evidence of real facts to the contrary.

   *Held* by WOODSON, J., dissenting, that the court cannot hold as a matter of law that the prima-facie case was completely overcome and destroyed by the evidence introduced by defendant, but whether or not it was so destroyed is a question for the jury, whose province it is to determine its credibility and weigh its probative force.

2. ————: ————: ————: Failure to Observe Master's Direction. Where the chauffeur was directed to take the automobile to the master's garage, which he could have done in an hour, and instead of doing so spent five hours or more driving over the city before (in a drunken state) he negligently ran the car against plaintiff, there is no presumption that at the time of the accident he was acting within the scope of his employment; but in order to hold his master liable for the damage, positive proof that he was in fact at the time of the accident engaged in the performance of duties for the master was required.

3. ————: ————: ————: ————: Having Car Repaired. The fact that, after the master directed the chauffeur to take the automobile to the garage, the chauffeur, who was an experienced mechanic, discovered a "knock" in the engine and, instead of remedying the defect himself, which he could easily have done, went to the general garage of cars of like manufacture, and there saw and took into his car the man in charge, does not establish that such trip was within his duties, even though he had been previously instructed to go to a machine shop and have some parts made. Especially is this true, where the facts show that the chauffeur for the next two hours, after making said trip and before the accident occurred, was engaged in a joy-ride and a drunken debauch.

4. ———: ———: ———: **Slight Deviations from Directions.** Slight deviations from the master's directions to his chauffeur, or incidental things done by him for his own benefit while in the line of his service for the master, will not destroy the presumption that the regularly employed chauffeur, at the time he negligently ran his automobile against a pedestrian, was acting within the scope of his employment. But the acts of the chauffeur in this case where not slight deviations, nor mere incidents of his employment, but destroyed the presumption.

Appeal from Jackson Circuit Court.—*Hon. Harris Robinson,* Judge.

REVERSED.

*Morrison, Nugent & Wylder* and *H. L. Hassler* for appellant.

(1) The evidence in the case does not make out a case of mere deviation. On the contrary, it conclusively shows that Hettenbaugh was using the automobile for his personal pleasure for a drunken carousal. The doctrine of deviation has never been applied to such a state of facts and under the evidence in the case, the demurrer should have been sustained. Reilly v. Connable, 214 N. Y. 586; Danforth v. Fisher, 75 N. H. 111, 21 L. R. A. (N. S.) 93; Eakin v. Anderson, 169 Ky. 1; Steffen v. McNaughton, 142 Wis. 49; Douglass v. Stephens, 18 Mo. 369; Symington v. Sipes, 121 Md. 313, 47 L. R. A. (N. S.) 662; Patterson v. Kates, 152 Fed. 481; Tyler v. Stephan, 163 Ky. 770; Slater v. Thresher Co., 97 Minn. 305; Garretzen v. *Duenekel,* 50 Mo. 107; Storey v. Ashton, 38 L. J. Q. B. 223 (which in effect overrules Sleath v. Wilson, 9 Car. & Payne, 607); Schoenhen v. Hartfield, 158 N. Y. Supp. 388. (2) Plaintiff's evidence raised no presumption that the chauffeur was acting in the scope of his employment. (a) Having shown that he had been using the car for his personal pleasure, the presumption is that the same condition existed at the time of the accident. Pope v. Cable Ry. Co., 99 Mo. 404; Nelson v. Jones, 245 Mo. 591; Dehner v. Miller, 166 Mo. App.

591. (b) Presumptions arise only when based on evidence consistent therewith and sufficient to support them. 16 Cyc. 1050; Elliott on Railroads (2 Ed.), sec. 1644; Woas v. Railroad, 198 Mo. 664; Rice v. Railroad, 153 Mo. App. 43; 6 Cyc. 629. (3) In any event, the presumption is overcome by the evidence in the case. Glassman v. Harry, 182 Mo. App. 304; Hurck v. Railroad, 252 Mo. 39; Berry on Law of Automobiles (2 Ed.), p. 694, sec. 615; Hite v. Railway Co., 130 Mo. 132; Davis v. Railway, 89 Mo. 350; Sowders v. Railroad, 127 Mo. App. 119; Mockowick v. Railroad, 196 Mo. 571; Tetwiler v. Railroad, 242 Mo. 194; Lotz v. Hanlon, 217 Pa. St. 339, 10 L. R. A. (N. S.) 202; 16 Cyc. 1087; Befay v. Wheeler, 84 Wis. 135; Elliott on Railroads (2 Ed.), sec. 1213; Huber v. Railway, 6 Dak. 392; Railroad v. Talbot, 78 Ky. 621; Volkman v. Railroad, 5 Dak. 69; Grundy v. L. & N. R. Co., 8 Ky. L. R. 689.

*Hogsett & Boyle* for respondent.

The demurrer to the evidence was properly overruled. (1) The evidence supports a reasonable inference that the chauffeur was using the automobile to look for the defendant's garage keys. (2) Proof that the automobile belonged to defendant, and was being operated by defendant's regularly employed chauffeur, was a prima-facie sufficient showing that the chauffeur was acting within the scope of his employment, and the burden of evidence shifted to defendant to show the contrary. O'Malley v. Construction Co., 255 Mo. 386; Shamp v. Lambert, 142 Mo. App. 575; Marshall v. Taylor, 168 Mo. App. 246; Wiedeman v. Taxicab Co., 182 Mo. App. 523; Long v. Nute, 123 Mo. App. 204; Fleishman v. Fuel Co., 148 Mo. App. 117; Vanneman v. Laundry Co., 166 Mo. App. 685; Fleishman v. Fuel Co., 163 Mo. App. 416. (3) This rule is just. For as between the injured person and the employer of the negligent chauffeur, the burden of evidence should rest upon him who is in the better position to know the facts. (4) The evidence of defendant's own chauf-

feur affirmatively shows that the chauffeur was acting within the scope of his employment. (5) Hettenbaugh's drunkenness is no defense. Whether drunk or sober, he was defendant's regularly employed chauffeur; and if he was acting within the scope of his employment defendant is liable. Whimster v. Holmes, 177 Mo. App. 135. (6) The evidence that other persons were in the automobile with Hettenbaugh at the time of the injury is weakened by the testimony of Dr. Whimster, and by the circumstance that at least one of the witnesses confused defendant's automobile with some other automobile entirely. (7) It is for the jury, not the court, to say which inference shall be drawn from the circumstances shown by the evidence. Linderman v. Carmin, 255 Mo. 62; Finnegan v. Railway, 244 Mo. 653; Hall v. Coal Co., 260 Mo. 351; Gilky v. Woodmen, 178 S. W. 875; Merritt v. Telephone Co., 215 Mo. 299; Luehrmann v. Light Co., 127 Mo. App. 213; Pohlmann v. Foundry Co., 123 Mo. App. 219. (8) After verdict in plaintiff's favor, the evidence must be viewed in the light most favorable to plaintiff, and where two inferences may reasonably be drawn from the evidence, the appellate court will adopt that one which is in aid of the verdict. St. Louis v. Packet Co., 214 Mo. 638; Hall v. Coal Co., 260 Mo. 351; Dunn v. Railway, 192 Mo. App. 260; Allen v. Railway, 189 Mo. App. 272; Merritt v. Matchett, 135 Mo. App. 176; Giddings v. Railway, 133 Mo. App. 610. (9) But even if defendant had produced direct evidence tending to show the chauffeur was not within the scope of his employment, the credibility and weight of such evidence was still for the jury. Gannon v. Gas Light Co., 145 Mo. 516; Mowry v. Norman, 204 Mo. 193; Printz v. Miller, 233 Mo. 47; Link v. Jackson, 158 Mo. App. 90; Winn v. Woodmen, 157 Mo. App. 11; Troll v. Home Circle, 161 Mo. App. 719; Davidson v. Railway, 164 Mo. App. 715; Clouts v. Gas Light Co., 160 Mo. App. 473. (10) The fact that some keys were found on Hettenbaugh after his arrest cannot avail defendant as a matter of law, because: it was a matter

going at most to the credibility of Hettenbaugh's testimony; there is no evidence that the keys found on Hettenbaugh were the garage keys; even if the garage keys had been found on him, this proved nothing, for possibly Hettenbaugh had actually found the keys before running over plaintiff; even if Hettenbaugh had never in fact lost the keys in the first place, yet if he thought he had, and started out with the car to look for them, the legal effect of his conduct would not be affected by the fact that he was mistaken about having lost them. (11) In cases where there is no direct evidence upon a point, it is competent for the jury to draw from the circumstances proved an inference as to the ultimate fact in issue. Meadows v. Insurance Co., 129 Mo. 76; Buesching v. Gas Light Co., 73 Mo. 219; Wack v. Railway, 175 Mo. App. 111; Johnston v. Railway, 150 Mo. App. 304. (12) On the former appeal defendant successfully contended that there was evidence showing whether Hettenbaugh was within the scope of his employment. Now defendant contends there is no evidence showing this. Defendant cannot thus shift positions. Tower v. Imp. Co., 192 Mo. 393; Coney v. Laird, 153 Mo. 435; McClure v. Clement, 161 Mo. App. 30; Davis v. Wackerle, 156 U. S. 689.

GRAVES, C. J.—This case reaches us upon a proper certification from the Kansas City Court of Appeals, there being a dissenting judge who deemed the majority opinion in conflict with opinions of this court, and expressed of record such views in an opinion filed.

The case was twice before the Kansas City Court of Appeals. First it was held (Whimster v. Holmes, 177 Mo. App. 130) that there were facts sufficient to take the case to the jury, but the judgment for plaintiff was reversed and cause remanded for error in an instruction. Upon a retrial plaintiff again received a verdict at the hands of the jury, and from a judgment thereon the present appeal arises. Upon a sec-

ond hearing in the Court of Appeals, the division of opinion occurred, and the dissenting judge now takes the position that the plaintiff failed to make a case.

That the evidence on the second trial must have been materially different from that upon the first is made clear by rulings in the first opinion. Thus in the first opinion we find this recited fact:

"And it was further shown that he was to overhaul the car and make some repairs during the absence of defendant, consulting with an expert in a certain public garage in the city."

No such statement of facts could be made on the present record, and from it we conclude the evidence before us is quite different from the record in the first appeal. However, we shall state the facts, as we find them in this record.

In March or April, 1912, the defendant employed one H. L. Hettenbaugh, as a chauffeur, and to take care of his two automobiles. Hettenbaugh was not only a chauffeur, but was an automobile mechanic, having had experience in repair shops. On July 10, 1912, defendant and his family and some others were going away from Kansas City, and Hettenbaugh drove defendant's wife, some members of his family and perhaps a Mrs. Edson, to the railroad station at Second and Wyandotte streets. Defendant had two automobiles, one a Packard touring car, used by Hettenbaugh on this occasion, and the other a Packard roadster, driven to the depot by defendant on this occasion. Defendant drove to the station, shortly before the time of the train's departure, and whilst there directed Hettenbaugh to take two acquaintances up town and then to take the car home. One of these acquaintances was to be taken to the Dwight Building at Tenth and Baltimore and the other to the Baltimore Hotel at Eleventh and Baltimore. There is no question as to the directions given Hettenbaugh at this time. The day before his departure, it appears that defendant had directed Hettenbaugh to thoroughly overhaul his cars, if he had time so to do, and especially the road-

ster.  Defendant, himself, only expected to be absent some ten days.  No directions were given about consulting Rogers, or any other expert about either of said cars.  Instead of the record showing that such directions were given, as indicated in the first opinion of the Court of Appeals, this record shows that they were not given.  It is true that Hettenbaugh says that on two or three previous occasions defendant had directed him to consult with one Rogers, at a garage at Thirty-fourth and Broadway, but there were no such directions at this time.

Defendant lived at the intersection of Harrison Street (a north-and-south street) and Armour Boulevard.  From the Baltimore Hotel, where the last passenger was to be left, to defendant's home was in a southeasterly direction.

We have given the directions of defendant to Hettenbaugh.  In the instant case it is admitted that the plaintiff was injured through the negligence of Hettenbaugh whilst driving the defendant's car.  The accident and injury occurred at Nineteeth Street and Grand Avenue about 7:30 in the evening.  Hettenbaugh left the railway station at shortly after 1:30.  It would require him about ten minutes to deliver the two passengers to their respective places and then thirty to forty minutes to drive the car to defendant's home.  By 2:30 at least, had defendant's directions been followed, his car would have been in the garage back of his residence.  The doings of Hettenbaugh become material at this point.  He says (and in this case two depositions of Hettenbaugh were introduced in evidence by the  plaintiff) that after delivering the passenger at the Baltimore Hotel, he drove back a block to the Dwight Building, wherein was the Pioneer Trust Company (with which defendant appears to have been connected) to get his check cashed, where he had to remain until after three o'clock for that purpose.  He then started south on Grand Avenue in the direction of defendant's home.  At Twelfth and Grand Avenue he stopped to get his laundry.  At Seventeenth and

Grand Avenue he stopped and talked with a friend by name of Davis (who was in the automobile business, but no talk about his car), and in a near-by section took a drink of liquor. He says that there was a knock in the engine of the car, and he concluded to drive to a public garage at Thirty-fourth and Broadway to consult one Rogers, who was an expert on Packard cars. That he took Rogers in the car and they drove to Fortieth and Broadway, as he says, so that Rogers might observe the car. Rogers says he was not advised with about the car at all, but that they took a drink at a saloon at that street intersection. In making this trip to Thirty-fourth and Broadway Hettenbaugh had gone considerably west and much south of defendant's residence, and his arrival there was about four o'clock in the afternoon. After returning to the garage with Rogers, Hettenbaugh went south on Main Street to Thirty-seventh and Main, his home, where he arrived, as he says, about five o'clock. About six o'clock he retraced his route, and seeing Rogers about to take a street car for his (Roger's) home took him in the car to take him home. Hettenbaugh had a young man with him at this time. Rogers was picked up at Thirty-third and Broadway. Thence the three went north to Fifteenth and Grand Avenue where they stopped at a saloon and got another drink. At this time Rogers noticed that Hettenbaugh was a little talkative, and he took the wheel and drove the car himself, with Hettenbaugh in the seat beside him. From this saloon Rogers drove east on Fifteenth Street to the Paseo, and thence south on Paseo to Howard, and thence east on Howard Street to Parke Avenue, his home. The car was then a mile and a half or more northeast of defendant's residence, and it was nearly seven o'clock in the evening. What became of the young companion does not appear. The doings of Hettenbaugh from the time he left the home of Rogers had better appear in his own language. His deposition was twice taken—once by plaintiff, and once by defendant—but both depositions were read in evidence by the

plaintiff in this second trial. It is largely upon these depositions that the Court of Appeals (majority opinion) find the liability of the defendant. In his deposition given on October 11, 1912, Hettenbaugh says:

"Q. Well, now, where did you go from Rogers' place, Mr. Hettenbaugh? A. I don't know. I could not answer that question properly.

"Q. Have you any recollection at all about it? A. Well, I have a faint recollection, but I could not be positive.

"Q. Well, what is your best recollection? A. My recollection is that I went on south from there, intending to go to the garage; that is, to his home, and put the car away, but it seems to me that when I got nearly to the place, I missed my keys, and whether I left them one place or another, I don't know, and never found them, and haven't found them yet, as far as that goes.

"Q. What keys do you refer to? A. The keys to the cars and the garage. They were on a ring.

"Q. Was the garage kept locked at all times? A. Yes, sir.

"Q. State whether or not you had received instructions from Mr. Holmes to keep the garage locked? A. Yes, sir; that was the first instruction that I got when I went to work for him.

"Q. What did you do then, when you missed your keys, Mr. Hettenbaugh? A. I couldn't answer that question for certain.

"Q. What is your best recollection? A. The only recollection that I have, I missed my keys—it seemed to me I did. Further than that, I don't remember any more. *I don't know where I went after that.*

"Q. Well, do you have any recollection of starting out to look for your keys?

"Objected to as leading and suggestive. Objection overruled.

"A. No, I have no other recollection of going to look for the keys, but as I remember it, I went back to the garage, and looked for my keys there, and they were gone. Further than that I cannot remember.

"Q. What was the next thing you do remember, Mr. Hettenbaugh? A. Well, the next thing I can remember, was that I woke up in No. 1 Police Station. That is about all I can tell you. I didn't know where I was then, but I found out pretty soon.

"Q. You have no recollection of running into anybody? A. Why, yes, I have a faint recollection of the accident of Fifty-second and——

"Objected to for the reason that it is leading and suggestive. Objection overruled.

"Q. Go on. A. I have a faint recollection of running into a man at Fifty-second and Oak, although I didn't have at that time. But since I have thought about it, thought it over, and studied over it, I think I remember of it now.

"Q. Do you recollect whether it was a man you ran into at Fifty-second and Oak, or another machine, which? A. Another machine, that I run into there, I think. As far as I can recollect.

"Q. You have no recollection of running into a man at Nineteenth and Grand? A. No, sir.

"Q. Then, if you were driving this car on Grand about Nineteenth Street, that afternoon, after you missed your keys, you do not know where you were going?

"Objected to as leading and suggestive. Objection sustained.

"Q. Do you have any recollection of driving your car on Grand near Nineteenth Street that afternoon, after you missed your keys? A. No, sir, I haven't.

"Q. Mr. Hettenbaugh, how did you come to go out to see Mr. Rogers about the car? A. How did I come to go out there? For a little information, I told you.

"Q. State whether or not you received any instructions from Mr. Holmes to consult Ben Rogers about repairs on the car?

"Objected to as leading and suggestive. Objection overruled.

"A.   No, sir.

"Q.   Was anybody with you after you left Rogers out at his place, Mr. Hettenbaugh?   A.   Not that I know of.

"Q.   Do you know why it is, Mr. Hettenbaugh, that you are unable to recollect what occurred after that time?   A.   No, not unless it was that I had had too many highballs.   That's the only reason I know.   You wanted the truth, and I am giving it to you.

"Q.   You say, Mr. Hettenbaugh, that Mr. Holmes never told you to consult Mr. Rogers?   A.   That is not the question you asked me.

"Q.   Did he ever tell you to consult Mr. Rogers?

"Objected to as immaterial, incompetent, and irrelevant.   Objections overruled.

"A.   Not that I remember of.

"Q.   At any time?   A.   I don't see that any other time has anything to do with it.

"Q.   Well, it has.   A.   Yes, regarding other times he did.

"Q.   How many times did you consult Mr. Rogers about it, Mr. Hettenbaugh—about Mr. Holmes's car?   A.   Twice or probably three times.

"Objected to as immaterial, what happened on other occasions.   Objection sustained.

"Q.   As I understand it, Mr. Hettenbaugh, you do not recollect anything where you went or what occurred, after you missed your keys?   A.   Well, no, not exactly, only the accident at Fifty-second and Oak.

"Q.   Do you know what time in the evening that was?   A.   No, I could not say what time it was.   I couldn't swear to it myself; they say it was about twenty-five or fifteen of eight.   That is the time they say.   Fifteen of eight, I think.

"Q.   You were still driving the seven-passenger Packard which belonged to Mr. Holmes?   A.   Certainly."

May 16, 1914, the defendant took the second deposition at Pasadena, California.   The whole of the second deposition reads:

272 Mo.—15

"Q. Mr. Hettenbaugh, where do you live at the present time? A. 258 North Vernon, Pasadena.

"Q. What is your name in full, please? A. Howard L. Hettenbaugh.

"Q. 'Howard L.,' you say? A. Howard L. Hettenbaugh.

"Q. Are you the Howard L. Hettenbaugh that at one time acted as chauffeur for Mr. Holmes, the defendant in this case? A. Yes, sir.

"Q. And you are the same Howard L. Hettenbaugh whose deposition was taken by the plaintiff in that case on or about the 11th day of October, 1912? A. Yes, sir.

"Q. Without expecting you to remember the exact date, you remember of giving your testimony? A. Yes.

"Q. And you are the man who was driving the car, the Packard automobile, of Mr. Holmes, on the night that this accident is alleged to have occurred? A. Yes, sir.

"Q. I think you have already testified that you have no recollection of being at the scene of the accident at the time when they allege? A. What accident?

"Q. Well, the place where Mr. Whimster alleges he was hurt. I believe you have already stated you have no recollection? A. No, sir.

"Q. Now, Mr. Hettenbaugh, when your deposition was taken the following question and answer was asked you: 'Q. Well, what is your best recollection? A. My recollection is that I went on south from there, intending to go to the garage; that is, to his home, and put the car away; but it seems to me that when I got nearly to the place I missed my keys, and whether I left them one place or another, I don't know. I never found them, and haven't found them yet, as far as that goes.' Now, you remember having so testified, do you, as I have read to you? A. Yes.

"Q. Or substantially that way? A. Yes.

Guthrie v. Holmes.

"Q. The keys you referred to were the keys of the garage, I believe; Mr. Holmes's garage? A. Yes, sir. Also some of my own keys on the ring.,

"Q. I suppose you had a ring on which you kept your own private keys? A. Yes.

"Q. And the keys to the garage? A. Yes.

"Q. Do you remember what you did after you missed your keys? A. The only thing I remember that I might have did was to have gone to look for the keys. But I don't know where; I have no recollection of where I went, definitely.

"Q. You don't remember definitely whether you went to Mr. Holmes's garage, or the Packard garage, or where you went, any place, do you? A. No.

"Q. And you have no definite recollection of even looking for the keys, have you, now, Mr. Hettenbaugh? A. Well, I have a recollection that I went there and missed the keys, and then went to look for them. Now, I would have no other mission out with the car that time in the evening.

"Q. Well, I mean you have a recollection that you missed them just before you got to his garage? A. Yes.

"Q. You haven't any recollection whether you went to the garage or not? A. Well, I couldn't say for sure that I stopped at the garage or that I didn't. As a possible chance, I may have stopped at the garage, but I would not want to say positively.

"Q. What I mean is, everything is a sort of blank, or hazy, after that, isn't it? A. Yes, sir; I don't remember clearly. Anyway, I could not prove it; if I thought I remembered something I could not have any proof for it.

"Q. And you have no recollection of looking any place, have you? A. Any particular place, you mean.

"Q. Any particular place. A. No.

"Q. You have no definite recollection, as I understand, of having reached Mr. Holmes's garage? A. Well, no; not except near there.

Guthrie v. Holmes.

"Q. Well, that is what I mean. But I mean getting right up to it? A. I remember being on the street where the garage was located; but I couldn't swear that I even went up into the garage, because, if I missed my keys it would stand to reason I couldn't get in the garage; because, if I missed my keys it would stand to reason I couldn't get in the garage if I didn't have my keys.

"Q. Well, you don't remember now that you ever got up there to see if the door was locked? A. No; I couldn't state positively that I went up to look if it was locked or not.

"Q. Now, you have no definite recollection of returning to the Packard garage, either, have you? A. Not definitely, no.

"Q. Now, Mr. Hettenbaugh, you hadn't been at Nineteenth and Grand at any time before you missed your keys had you? A. Do you mean stopped there or passed there?

"Q. Passed there. A. Certainly; I had to pass Nineteenth and Grand in order to go home, if I went the direct route.

"Q. You went the direct route. Well, you have no recollection of returning there? A. No, sir.

"Q. To look for the keys, or returning there at all, have you? A. No, sir.

"Q. Now, in your previous deposition, following the question which I have asked you, you were asked the following question: 'Q. Well, now, have you any recollection of starting out to look for your keys? A. No; I have no other recollection of going to look for the keys, but, as I remember it, I went back to the garage and looked for my keys there and they were gone. Further than that I can't remember.' A. I couldn't look in the garage for the keys unless I had the key to the garage, you understand.

"Q. Well, now, that is the way your testimony appeared? A. Well, there is a miscue of it there some place. The typist may have made a mistake, or something; but I didn't mean it that way.

"Q. Let me finish my question. The question and answer I have read you appear to be part of your deposition as the same has been furnished me in the printed record in this case. Now, did you mean to testify that you went to a garage to look for your keys? A. No, sir.

"Q. That is a mistake, is it? A. It is a mistake. I mean to testify that I went toward the garage or to the garage, very near to the garage, and missed my keys and then went to look for them.

"Q. I see. When you said 'the garage,' 'going nearly to the garage,' you were referring to Mr. Holmes's garage? A. I didn't mean it that way. It is a mistake. Mr. Holmes's garage was the garage I was to have went to.

"Q. When you told me just a minute ago that you missed your keys when you were nearly to the garage, you meant Mr. Holmes's garage? A. I mean Mr. Holmes's garage.

"Q. Then, the answer that you have apparently given in your former deposition, that you went to a garage, you say is a mistake? A. Well, Mr. Holmes's garage is the garage I meant; but I didn't mean I went to the garage to look for the keys. I meant I went to the garage, and when I got there I missed my keys and then went to look for them.

"Q. Well, then, this answer that I have read to you, 'No; I have no other recollection of going to look for the keys, but, as I remember it, I went back to the garage, and looked for my keys there and they were gone,' that is a mistake? A. I didn't mean that I looked in the garage. I looked for the keys in my pocket.

"Q. That is where you meant? A. Yes.

"Q. You didn't mean by that answer that you went back to the Packard garage for your keys? A. No, not in particular. I may have gone there, but I didn't mean that in that statement.

"Q. Well, that garage that you referred to was Mr. Holmes's garage? A. Was Mr. Holmes's garage.

Guthrie v. Holmes.

"Q. And when you say you may have gone to the Packard, you don't know whether you did or not? A. No; I would not say.

"Q. You have no recollection one way or the other? A. No, sir.

"Mr. Sterry: That is all.

"Cross Examination by Mr. Sanford.

"Q. Do you have a distinct recollection of looking for your keys? A. Yes; I have a recollection of going to look for my keys—going to the garage first and missing my keys and then going to look for them.

"Q. When you say 'going to the garage,' you mean going up to near the garage? A. Yes; within a block or two, anyway.

"Q. Mr. Sterry: That is, Mr. Holmes' garage?

"Q. Mr. Sanford: Yes. That is, Mr. Holmes's garage? A. Yes.

"Q. It is possible that you may have gone to the Packard garage subsequently to missing your keys, in your search for them?

"Mr. Sterry: I want to enter an objection, on the ground that the question is leading and suggestive, and that this is merely a continuation of the former deposition and would be a cross-examination of your own witness and a leading question.

"A. Yes, sir.

"Mr. Sterry: Mr. Sanford, in making objections, if I should make any future objections on the ground that it is leading you will not require me to take up space by repeating that it is on the theory that this is a continuation of a former objection?

"Mr. Sanford: No.

"Mr. Sterry: But you will understand that that is the ground on which I base any objection to a question as leading?

"Mr. Sanford: Yes.

"Q. I believe you have testified that it would be impossible to get into the garage without your keys? A. Yes.

"Q. And that Mr. Holmes had instructed you to always keep the garage locked?

"Mr. Sterry: Object to that on the ground that it is leading and suggestive, calling for hearsay testimony; that it is incompetent, irrelevant and immaterial.

"A. Yes, sir.

"Mr. Sanford: I don't believe I will ask any more questions. That is all.

"Redirect Examination by Mr. Sterry.

"Q. Mr. Holmes's son had a key to the garage, too did he not? A. Yes.

"Q. Of course you can't say whether he might not have left the garage open, or not, can you? A. May I explain that?

"Q. Sure. A. Well, I don't know positively that he had a key to the garage, or whether he got Mr. Holmes's key; but I think that the three of us had a key to the garage.

"Q. Well, then, it would have been possible for the garage to have been left open by Mr. Holmes's son, if he had a key? Is not that so? A. Yes; provided he got there before I did.

"Q. That is what I say. You have no recollection of going up to see. As I understand your testimony, you may have gone to the door and found it locked; and you may have taken it for granted it was locked? A. Yes.

"Mr. Sterry: I think that is all.

"Recross Examination by Mr. Sanford.

"Q. Did Mr. Holmes's son live with him? A. No, sir.

"Q. He didn't live there? A. No, sir.

"Q. Do you know where he did live? A. He lived on Paseo Boulevard. I can't remember the number, though; but it was thirty-four and something, I think. It was on Paseo between Linwood and Armour.

"Q. That is about how many blocks from where Mr. Holmes, Senior, lives? A. About seven or eight blocks, I judge.

"Mr. Sanford: That is all.

"Direct Examination by Mr. Sterry.

"Q. He was driving the little Packard that day, was he not? A. Both Packards were the same size, except one was a touring car and the other was a roadster.

"Q. I mean Mr. Holmes's son was driving the roadster that day? A. Yes, sir.

"Q. And he left it —A. From the depot.

"Q. From the depot? Well, that is what I meant. You didn't drive the runabout at all? A. No, sir.

"Q. And the runabout was always left at Mr. Holmes's garage, was it not? A. Yes, sir.

"Q. You are regularly employed as a chauffeur, now, in Pasadena, are you not? A. Yes, sir."

From evidence other than Hettenbaugh it is shown that he negligently ran into plaintiff at Nineteenth and Grand Avenue whilst plaintiff was in the act of boarding a street car, then standing and waiting for the reception of passengers. That there were other parties in the car with Hettenbaugh at the time of this collision there can be no question under the proof. The number ranges from two to four, in addition to Hettenbaugh and some of them were women according to some of the witnesses. Hettenbaugh was driving south on Grand Avenue at the time of the accident and continued south, at the rate of about twenty miles per hour. The accident occurred about 7:30 in the evening. The street car man, who reported it to his company, by referring to his report fixes it at 7:33. Shortly before eight o'clock, or about eight o'clock, Hettenbaugh and the car were again heard of at Fifty-second and Oak streets, where he had a head on collision with the car of George B. Calvin. Mr. Calvin got out of his car and started toward Hettenbaugh, and Hettenbaugh ran and got on the running board of a car which was passing. His conduct was such that Mr. Moore, the owner of the car, knocked him from the car and down to the street, after running a couple of blocks. Shortly thereafter a police ambulance picked him up and took him to an emergency hospital for treatment. He was drunk at this time, but roused up about midnight and was placed in the police holdover. In his car were found three bottles (unopen-

ed) of beer, and some tops to beer bottles. The police surgeon says that he had some money, an abstract of title, two bunches of keys and some wrenches on him when picked up by the ambulance. The money and abstract he took and the next day gave them to Hettenbaugh's wife. The other things he put back in his pockets. The police records show that he had keys and automobile wrenches on his person when he was searched at the holdover. The foregoing fairly states the facts of this quite lengthy record.

I. The law of this case should not be difficult. A sifting of the facts, and the application of sound rules of law, is the tedious process required at our hands. By respondent it is urged:

"Proof that the automobile belonged to defendant, and was being operated by defendant's regularly employed chauffeur, was a prima-facie sufficient showing that the chauffeur was acting within the scope of his employment, and the burden of evidence shifted to the defendant to show the contrary."

Presumptions.

We are inclined to the view that this does not too broadly state the presumption of fact (which arises from proof of ownership of the car and proof of the general employment of the chauffeur) to the effect that such chauffeur was within the scope of his employment. To state it differently, if it be proved (as here) that the car was owned by defendant, and if it be further proved (as here) that the chauffeur was in the general employment of defendant, then the presumption arises that such chauffeur was within the scope of his employment when the accident occurred. This, however, is as broad as the rule goes. From such a showing the plaintiff has a prima-facie case resting upon this presumption. Presumptions of this character (like all presumptions as to a fact in a case) take flight upon the appearance in evidence of the real facts. In Berry on Law of Automobiles (2 Ed.), section 615, p. 694, the doctrine is well stated:

"This presumption cannot stand in the face of positive proof of facts to the contrary; and where the

plaintiff has relied upon such presumption and it has been opposed by positive evidence to the contrary, he must then produce evidence tending to disprove the defendant's positive testimony, or his prima-facie case will fall. The presumption in question is rather a frail thing. It is unlike an inference that arises upon the proof of certain facts, and which is necessarily true if the facts are true. It rests upon the facts that the automobile was owned by the defendant and that the chauffeur who was operating it was in the general employment of the defendant; neither one or both of which actually tends to prove that the chauffeur was engaged in the owner's business.''

To like effect is the opinion of WILLIAMS, Commissioner, in Hurck v. Railroad, 252 Mo. l. c. 48, whereat he said:

"The above stated exception to the general rule is, it will be seen, wholesome doctrine, for if either by plaintiff's own evidence or by the evidence offered by defendant it appears that the unusual happening (which by its very nature raises the presumption of negligence) was caused solely by *vis major*, or by any other instrumentality disconnected from any negligence of defendant, the presumption is undermined and falls and no case is made, and in that situation the plaintiff must fail unless he goes forward with evidence showing specific negligence.''

In that case the plaintiff was relying upon presumptive negligence. A train had been derailed, and the plaintiff injured. The defense was that the derailment was occasioned by an act of God.

In Sowders v. Railroad, 127 Mo. App. 119, NORTONI, J., thus states the rule as to presumptions of the character here invoked. He says:

"All presumptions of fact proceed from other facts in proof (Lawson on Presumptive Evidence, 652), and supply an omitted fact in accord with the dictates of human experience on like questions. They are therefore rebuttable or disputable as a matter of course. Inasmuch as such presumptions merely amount to an as-

sumption of what may be true, as indicated by the prob-
abilities and the rationale of experience they may be
entirely overcome or removed from the case by com-
petent proof going to supply the fact presumed.[Lawson
on Presumptive Evidence, 559; 22 Am. & Eng. Ency.
Law (2 Ed.), 1235-1236; Morean v. Branham, 27 Mo.
351; Ham v. Barret, 28 Mo. 288.] And it is the well-
established law that a presumption of fact will not be
permitted to contradict or overcome facts actually
proved. [Lawson on Presumptive Evidence, 659; Whita-
ker v. Morrison, 44 Am. Dec. 627; Morton v. Heidorn,
135 Mo. 608-617.]''

In the case at bar the defendant at about 1:30 p.m.
directed this chauffeur to take his car to the garage at
his home. Both the evidence for the plaintiff and for
the defendant shows this fact. The evidence shows that
an hour's time was ample for this purpose, after making
liberal allowances for time to deliver the two passengers
that defendant placed in his custody. This accident did
not occur until 7:30 or some six hours after the direc-
tions were given to the chauffeur, and five hours after
he should have had the car in defendant's garage. With
this showing it would be to strain the law to say that
at 7:30 there was the presumption of fact that the ser-
vant was about his master's business. This showing of
facts destroyed the presumption, and it then became
the duty of plaintiff, in order to make a case for the
jury, to show as a fact, that at the time of the accident
(7:30 p. m.) the servant was in fact about his master's
business. The trip to see Rogers at Thirty-fourth and
Broadway can not be considered within the scope of
his duties, because both Hettenbaugh (plaintiff's wit-
ness) and the defendant, say that Hettenbaugh had been
given no such directions at that time. So that we reiter-
ate, that it was for the plaintiff to show (not for the jury
to presume from the fact that defendant owned the car
and had Hettenbaugh in his general employment) that
at the time of the accident the chauffeur was in fact en-
gaged in the performance of a duty for the master. The
majority opinion of the Court of Appeals concludes that

the trip to see Rogers was one within the duties of the chauffeur. We cannot view it in that light under this evidence. The evidence all agrees that there was no such direction from the master, although there was a direction to go to a machine shop and have some parts made. The "knock" in the engine is shown to have been caused by carbon in the cylinder. Hettenbaugh was an experienced mechanic and it appears was paid good wages for that reason. No good reason appears in the evidence for this trip to Rogers, because the experience of Hettenbaugh was such that he could have remedied that trouble. Nor was it shown that defendant even had knowledge of this "knock" in the engine, when he gave the directions. Because the master may have previously directed that the car be taken to Rogers for work thereon, is not sufficient to license Hettenbaugh, the chauffeur and mechanic to go there at this time, and for the purpose indicated by his evidence in this record. When said chauffeur failed to return the machine to defendant's garage as he was directed, and spent some five hours or more driving over the city, it required proof positive that he was on a mission for the master at the time of the accident, in order to hold the master.

II.   By what we have written above, we do not mean to say that slight deviation from a direct route to defendant's garage, would exonerate the master from the negligence of the servant, nor do we mean that slight things done by the chauffeur for his own benefit, which were mere incidents, whilst in the line of his service of the master would destroy the presumption. To be explicit, it appears that this servant stopped at Thirteenth Street and Grand Avenue for his laundry. He was then within reasonable lines of his direction to the home. Such an incident might be considered as merely incidental, and not necessarily out of line of his duty to the master. But what we do mean to say is, that the great number of things in this record prior to the accident, when considered with the directions given to the chauffeur, is sufficient to destroy

Slight Deviations.

the presumption, and render it necessary for the plaintiff to make proof of the fact, that the agent was in the service of the master at the hour of the accident.

The rule announced in Daily v. Maxwell, 152 Mo. App. l. c. 426, is a reasonable one. It reads thus:

"All the authorities are in accord in holding that in an action based on the negligent running of an automobile the owner of the car who was not present at the infliction of the injury cannot be held liable except it be shown that the person in charge not only was the agent or servant of the owner, but also was engaged at the time in the business of his service. [Evans v. Automobile Co., 121 Mo. App. 266; Lotz v. Hanlon, 217 Pa. 339: Slater v. Thresher Co., 107 N. W. 133; Patterson v. Kates, 152 Fed. 481; Reynolds v. Buck, 103 N. W. 946; Clark v. Buckmobile Co., 94 N. Y. Supp. 771; Howe v. Leighton, 75 Atl. 102:.Jones v. Hoge, 92 Pac. 433; Lewis v. Amorous, 59 S. E. 338.]

"Where a chauffeur, either with or without his master's consent, uses the machine for his own business or for his own pleasure and negligently inflicts injury on another, the master cannot be held liable, for the reason that the negligent act being entirely outside the scope of the servant's employment, cannot call into action the rule of *respondeat superior*. The fact of consent is material only in the solution of the issue of whether or not the use of the machine was, in fact, on business of the master."

To this should be added that if the ownership of the car be shown to be in defendant, and the chauffeur is shown to be in the general employ of the defendant, then there would be a presumption that he was in the service of the master at the time, which presumption would take flight upon the appearance in evidence of the facts themselves.

III.   From the foregoing conclusions it becomes necessary to examine the facts and determine whether or not there is substantial evidence in behalf of the plaintiff,

tending to show that Hettenbaugh was, as a fact, in the performance of a duty for the master at the time of the accident. The only evidence on this point is that of Hettenbaugh in the two depositions. The only duty is the alleged hunting of the garage keys, which were supposed to be lost. It is urged that Hettenbaugh might have retraced his steps and gone back to his first stops at Twelfth and Grand Avenue and at Seventeenth and Grand Avenue for the purpose of finding his keys. Hettenbaugh says he does not know where he went. Again it is shown that he had a companion with him when he took Rogers home shortly before seven o'clock. At the very instant of the accident he had persons in the automobile with him. This was at 7:30 and at Nineteenth and Grand Avenue. In about fifteen or twenty minutes he collided with another car at Fifty-second Street, at which place three bottles of beer were found in his car, as well as tops which came from beer bottles. It is true he had no companions then, and where he left them is not known, but that he did have them when the accident occurred there is no question under this proof. Hettenbaugh says that he did not know that he struck plaintiff. Putting all these facts together, they comport more nearly with the idea that Hettenbaugh was out on a drunken joy-ride, rather than with the idea that he was searching for lost keys. Remembering that he knew nothing of hurting the plaintiff, upon what theory could it be said that he was returning from a trip to recover lost keys, when he was found at Fifty-second Street, a great distance (two to three miles) south of the master's garage. The whole facts tend most strongly to show that when arrested he was winding up a debauch which began early in the afternoon at Seventeenth Street and Grand Avenue. Then again, when his evidence is read, it is clear that his recollection of what occurred after he left Rogers at about seven o'clock is too hazy to be of much value. He says he does not know where he went after reaching the neighborhood of the defendant's garage. If he returned to

Facts Destroying Presumption.

places where he had been during the afternoon to look for keys, no doubt more substantial evidence could have been secured. In the dissenting opinion of Judge JOHN-SON he sets out most of the evidence from Hettenbaugh, which we have set out. [190 S. W. 1. c. 68.] He then says:

"Such testimony is wholly worthless and it should be held that there is no proof in the record of the move-ments of the chauffeur from the time he and his com-panion left Rogers at Twenty-fourth and Park at 6:40 p. m. until 7:30, the time of the injury. This we do know: He returned downtown, gathered up more com-panions and proceeded south on Grand Avenue—not to return to defendant's residence—there is no evidence of such intention—but to drive out into the country south of Kansas City. There is evidence that some of the occupants of the car were women and there were bottles of beer aboard. Finally at about eight o'clock p. m. they met disaster at Fifty-second and Oak Streets about two and a half or three miles south of defendant's home, where they had a head-on collision with another car. The chauffeur, drunk and excited, tried to escape from the scene, but in a fight that followed, was knocked senseless and afterwards taken to police headquarters and lodged in jail. One of the city physicians, who was not a witness at the former trial, testified that he went in the ambulance to the scene of the wreck and found the chauffeur lying on the pavement wounded on the head and in a state of intoxication. He searched his pockets, finding money, an abstract of title, automobile tools and two bunches of keys. He took charge of the money and abstract for safe-keeping, and returned the tools and keys to the chauffeur's pockets. The property clerk at police headquarters, also a new witness introduced by defendant, produced the records of his office which show that a chain, a wrench and 'two keys' were taken from the chauffeur's pockets and, not being called for, were afterwards sold at an auction sale.

"The day before he left for the North defendant ordered the chauffeur to put his Packard runabout and the touring car in good repair during his absence, but did not direct him to consult or employ Rogers. Let it be conceded, however, for present purposes that the chauffeur went to the garage at Thirty-fourth and Broadway to consult Rogers about his master's affairs, and in so doing was acting within the scope of his employment. When that duty was fully performed—and it was so performed when he left Rogers about four o'clock—it became his duty to drive the car to defendant's garage which was straight east only a mile away. Instead of doing this he kept the car in his own service two hours, during which he became intoxicated, and then reappeared with it at the Broadway garage and from near there picked up Rogers and drove north downtown for no other purpose than the gratification of his own pleasure. There is not the slightest pretense in the evidence that from about four o'clock until 6:40 when they arrived at Roger's home, the chauffeur was directly or indirectly in the service of defendant, and, as shown, there is no credible evidence that, on leaving Rogers, he started to take the car to defendant's garage and thereby returned to the performance of a duty he owed defendant.

"All that is shown with any degree of definiteness is that the chauffeur and his companion, still in pursuit of a drunken carouse, returned downtown, secured dissolute companions, procured a supply of intoxicants and headed straight for the country, injuring plaintiff on their way. The chauffeur had no knowledge of the collision with plaintiff, and, therefore, no cause to change his plans. Confessedly he was not in quest of lost keys when he struck plaintiff, and obviously, he had no purpose of returning the car to defendant's garage until after the debauch had burnt itself out. He does not say he was on his way home, but says he has no recollection of what occurred or what he was doing. He never did reach the point of returning to defendant's

service since, when he wrecked defendant's car by reckless driving, he was still in pursuit of his own pleasure.

"The law applicable to such facts is simple and well settled and is properly stated in our former opinion. The doctrine of liability of the master for the wrongful acts of his servant proceeds from the maxims of '*respondeat superior*' and '*qui facit per alium facit per se,*' and therefore is a doctrine of the law of agency which holds the master responsible for the torts of his servant committed within the actual or apparent scope of his servant's employment.

"It is elementary that the master is not liable for injuries occasioned to a third person by the negligence of his servant while the latter is acting beyond the scope of his employment for his own purposes, although he may be using the vehicle furnished him by the master with which to perform the ordinary duties of his employment. Where the servant, in carrying out the master's orders, merely deviates on some errand of his own from the strict course of duty, but while thus going *extra viam* is really engaged in the execution of some duty of his employment, or where he forsakes duty entirely for a time but returns to its path, the master will be liable for his negligence which injures a third person, under the doctrine of *respondeat superior* (see authorities reviewed in former opinion).

"The facts of the present case lend no support to an inference that the chauffeur either was going *extra viam* while performing a duty of his service, or had returned to such service at the time of his injury. He was clearly and indisputably beyond the actual or apparent scope of his employment and without his master's knowledge or consent had appropriated and was using the latter's car for his own exclusive purposes without any show or pretense of service of the master. In such a case there can be no liability under the rule of *respondeat superior* since no agency of the servant may be implied to do a thing so excessive. [Slater v. Thresher Co., 107 N. W. 133, 97 Minn. 305; Storey v. Ashton, L. R. 4 Q. B. C. 476; Cavanagh v.

272 Mo.—16

Dinsmore, 12 Hun, 465; Daily v. Maxwell, 152 Mo. App. 415; Lotz v. Hanlon, 217 Pa. St. 339; Patterson v. Kates, 152 Fed. 481; Danforth v. Fisher, 75 N. H. 111; Douglass v. Stephens, 18 Mo. l. c. 368; Garretzen v. Duenckel, 50 Mo. l. c. 107; Walker v. Railway, 121 Mo. 575; Evans v. Auto Co., 121 Mo. App. 266; Vanneman v. Laundry Co.; 166 Mo. App. 685.]

"The demurrer to the evidence should have been sustained."

We agree to these views, except the concession made for the argument, that it might be conceded that the servant was in the discharge of his duties when he went to the garage at Thirty-fourth and Broadway at about four p. m. We do not think the chauffeur was then in the discharge of his duties, but this only lengthens the time of his trip of pleasure, and therefore not very material. The judgment *nisi* should be reversed and it is so ordered.

PER CURIAM:—The foregoing opinion of GRAVES, J., in Division is adopted by the Court in Banc as the opinion of the Court in Banc. *Walker, Blair* and *Williams, JJ.,* concur; *Bond* and *Faris, JJ.,* concur in result, *Woodson, J.,* dissents in opinion filed.

WOODSON, J. (dissenting)—While I believe the verdict and judgment in this case are unjust, not supported by the greater weight of the evidence, but in fact against it, and ought to be set aside on that account, because I believe the trial court abused its sound judicial discretion in not granting a new trial on that ground, yet I am clearly of the opinion that after the plaintiff has made out his prima-facie case which is conceded in this case as I understand the majority opinion, the court cannot sustain a demurrer to the plaintiff's evidence, or otherwise take the case from the jury on account of evidence subsequently introduced by the defendant; and for that reason I am of the opinion that my learned associate in so far as he holds that plaintiff's prima-facie case was completely overcome and destroyed by

the evidence subsequently introduced by the defendant, and for that reason the demurrer to plaintiff's case should have been sustained, is in error.

In discussing this question, this court, in the case of Peterson v. Chicago & Alton Ry. Co., 265 Mo. 462, 1. c. 479, said:

"The second proposition presented is: Was the plaintiff under the facts disclosed by the evidence guilty of such contributory negligence that the court should have declared, as a matter of law, that he could not recover? The question of contributory negligence, as a rule, is a matter of defense which must be pleaded and proven by the defendant.

"As held in paragraph one of this opinion, the plaintiff having made out a prima-facie case, then according to the rule just announced the burden rested upon the defendant to disprove and overcome that case, to the satisfaction of the jury. That, of course, means that the jury and not the court must pass upon the credibility of the witnesses and the weight to be given to their testimony. That is, after a prima-facie case has once been made out, the case can never be taken from the jury. [Boone v. Railroad, 20 Mo. App. 232; Kenney v. Railway, 80 Mo. 573; Gregory v. Chambers, 78 Mo. 298-9; Cannon v. Moore, 17 Mo. App. 102; Gibson v. Zimmerman, 27 Mo. App. 90; Milliken v. Comm. Co., 202 Mo. 637; Rinehart v. Railway, 204 Mo. 276; Vincent v. Means, 184 Mo. 340-341; Bryan v. Wear, 4 Mo. 106; Vaulx v. Campbell, 8 Mo. 224; Wolff v. Campbell, 110 Mo. 114; Randle v. Railway, 65 Mo. 334; McAfee v. Ryan, 11 Mo. 364; Steamboat City of Memphis v. Matthews, 28 Mo. 248; Bradford v. Rudolph, 45 Mo. 426; Wood v. Railway, 181 Mo. 445; Hipsley v. Railway, 88 Mo. 352; Meyers v. Trust Co., 82 Mo. 240; Dalton v. Poplar Bluff, 173 Mo. 47; Mineral Land Co. v. Ross, 135 Mo. 101; Huston v. Tyler, 140 Mo. 252; Gordon v. Burris, 141 Mo. 602; Cornwell v. Wulff, 148 Mo. 542; Seehorn v. Bank, 148 Mo. 265; Weinberg v. Street Ry. Co., 139 Mo. 290; Seawell v. Railroad, 119 Mo. 222; Schroeder

v. Railroad, 108 Mo. 322.; Seligman v. Rogers, 113 Mo. 649.]''

I venture the assertion that the cases cited in support of the rule announced in that case do not constitute one-tenth of the cases in this State announcing the same doctrine; and notwithstanding this well-established rule, the majority opinion in this case brushes it aside and emasculates it with a single breath.

While it is true the doctrine announced in the majority opinion is supported by Berry on Law of Automobiles (2 Ed.), sec. 615, p. 694, yet it appears to me that his reasoning is more plausible than sound.

The rule as stated by the learned author is as follows:

''This presumption cannot stand in the face of *positive proof of facts to the contrary;* and where the plaintiff has relied upon such presumption. and it has been *opposed by positive evidence to the contrary,* he must then produce evidence tending to *disprove the defendant's positive* testimony or his prima-facie case will fall. The presumption in question is rather a frail thing. It is unlike an inference that arises upon the proof of certain facts, and which is necessarily true if the facts are true. It rests upon the facts that the automobile was owned by the defendant and that the chauffeur who was operating it was in the general employment of the defendant; neither one nor both of which actually tends to prove that the chauffeur was engaged in the owner's business.'' (The italics are ours.)

A foreword: In order that I may not be misunderstood I desire to state that I understand the majority opinion to hold that if the positive evidence introduced by either the plaintiff or the defendant shows that the injury complained of was caused by an instrumentality disconnected from any negligence of the defendant, the presumption arising from the proof that the chauffeur was in the general employment of the defendant, and that he was operating the car at the time of the injury, constitutes prima-facie evidence that the former was acting within the scope of his employment at the

time of the injury, is undermined and the prima-facie case of the plaintiff falls, and no case is made, and in that situation the plaintiff must fail unless he goes further and shows by specific evidence that the negligence of the defendant caused the injury.

Now, in so far as that rule applies to the plaintiff's evidence, I have no special complaint to make, save that it is rather broadly stated, not excluding certain well known exceptions thereto, but I deny the rule is sound when applied to the evidence of the defendant, as I will now try to show. But before doing so, it seems to me the author attributes undue significance to the words "positive proof," "positive testimony," "specific evidence," etc., for the obvious reason that the jury must pass upon the evidence, whether it is positive, specific, direct or inferential.

Returning to the question in hand: The vice of the rule stated by Mr. Berry is indicated by the italicized words. In substance they declare the law to be that, notwithstanding the fact that plaintiff has made out his prima-facie case, yet if the defendant introduces "positive evidence" to the contrary, then the plaintiff cannot recover, without he introduces "evidence (in rebuttal) tending to disprove the defendant's positive testimony." In other words, the rule announces the astounding doctrine in that after the plaintiff has made out a prima-facie case, it then becomes the duty of the court, if the defendant introduces evidence tending to show that the injury was caused by some independent agency over which he had no control, thereby disproving the plaintiff's prima-facie case, to declare as a matter of law the plaintiff could not recover without he introduces evidence in rebuttal tending to contradict the evidence so introduced by the defendant.

Stripped of all useless and confusing verbiage, that is the true rationale of the rule announced by Mr. Berry and followed in the majority opinion; and I submit, if sound, by the same rule of reason when the plaintiff introduces his evidence in rebuttal contradicting that of the defendant, then the court should instruct the jury to

find for the former, without the latter should introduce additional evidence tending to disprove that introduced by the plaintiff in rebuttal, and if logically followed to the end, the trial of the cause would thus go on to the end of time, without one of the parties should become weary and quit the fight; and even in that event, the court and not the jury would find the facts. Such is not the law.

As previously stated, the law is that where the plaintiff makes out a prima-facie case against the defendant, although the defendant may introduce evidence which entirely overthrows and disproves the prima-facie case so made, yet the trial court cannot say, as a matter of law, that it is so overthrown and direct a verdict for the defendant. [See cases cited.]

This rests upon the constitutional right to a trial of all such causes by a jury, whose exclusive province it is to pass upon the credibility of the witnesses produced by the defendant, as well as by the plaintiff, and the weight and value to be given to their testimony. Under the rule announced in the majority opinion, the court passes upon the credibility of the witnesses introduced by the defendant and the weight to be given to their testimony, and declares whether or not the prima-facie case has been overcome, while the jury passes upon the credibility of those introduced by the plaintiff and the weight to be given to their testimony. I repeat that is not the law; what is sauce for the goose is sauce for the gander.

Moreover, to make my assault upon Mr. Berry's rule perfectly plain and unanswerable, as it seems to me: Suppose that the only evidence that had been introduced by the plaintiff in this case had been to the effect that Hettenbaugh, the chauffeur, was in the general employment of Holmes, the defendant, to operate the car in question, and that while so operating it he ran the same against the plaintiff and injured him; this, the majority opinion holds, and all concede, would have made out a prima-facie case for the plaintiff, and had the defendant introduced no evidence in defense, the trial

court, under the authorities before cited, would have been required to have submitted the case to the jury on that evidence alone, and had the jury found for plaintiff, that evidence would have been sufficient to have supported the verdict; this, no one will deny. But the dispute arises over the following supposition I am about to state, namely: Suppose the defendant, instead of having declined to introduce any evidence in the case, as previously supposed, had in fact offered. Hettenbaugh, the chauffeur, as a witness, and that he had testified that he was not pursuing his master's orders at the time he struck and injured the plaintiff, but was out on a drunken joy-ride, as suggested by the majority opinion; and suppose further, that as a matter of fact, that evidence of Hettenbaugh was not only not true, but was deliberate perjury, which all must concede might be possible, then how would the case stand? Would that testimony, though absolutely false, be sufficient, as a matter of law, to completely overcome and destroy the plaintiff's prima-facie case? I think not; at least, under our rules of practice, which are based upon the constitutional right to a trial by jury, the jury at least should be permitted to find whether or not said testimony was true or false, and the court should not, and is not authorized to declare as a matter of law that perjured testimony in a trial before a jury is sufficient to destroy plaintiff's prima-facie case. If this is not true, and the court is clothed with such authority, then perjury might stand at a premium in the jurisprudence of this State, for we have previously shown that if defendant had not introduced any evidence at all, the prima-facie case made by him would have been sufficient to have supported the verdict; but under the second supposition mentioned, the perjured testimony would, as a matter of law, have utterly destroyed that case.

To my mind the rule announced by Mr. Berry is predicated upon sophistry and not reason or authority.

I therefore dissent from the majority opinion and am of the opinion that the judgment should be reversed and the cause remanded for another trial for the reasons before stated.