MARIA KILROY, Respondent, v. CHARLES L. CRANE AGENCY COMPANY, a Corporation, Appellant.

St. Louis Court of Appeals. Opinion Filed January 6, 1920. Rehearng Denied February 24, 1920.

1. **MASTER AND SERVANT:** Negligence: Automobile: Owner's Liability for Chauffeur's Negligence: Chauffeur Must be Acting Within Scope of Employment. In an action against the owner of an automobile based upon the negligence of the chauffeur, etc., there must be some evidence of the fact that the chauffeur at the

time of the accident was engaged in the performance of a duty for the owner, or at least facts must be established from which a reasonable inference can be drawn that the chauffeur was acting at the time within the actual or apparent scope of his employment in order to call into action the rule of *respondeat superior*.

2. ——: —— : ——: ——: **Rule as to Burden of Proof.** Proof of the employment of the chauffeur by defendant and proof that defendant owned the automobile raised a presumption that the chauffeur at the time was acting within the scope of his employment and makes a prima-facie case, which, however vanishes upon the appearance of evidence of real facts to the contrary, and, where these facts appear by defendant's evidence, the duty is then cast on plaintiff to produce some evidence of the fact that the chauffeur was actually engaged at the time of the accident upon the business of the defendant.

3. **EVIDENCE: Inferences: One Inference Cannot be Based on Another.** An inference must be drawn from facts and cannot be based on another inference.

4. ——: **Presumptions: One Presumption Cannot be Based on Another.** Likewise, a presumption cannot be based on a presumption, but must arise from the facts.

5. **MASTER AND SERVANT: Negligence: Automobiles: Owner Not Liable for Negligence of Chauffeur Engaged on Personal Errand.** Where an automobile accident occurred and the chauffeur at the time was not driving the automobile upon the business of his master but was engaged upon a purely personal errand for his own pleasure, the master cannot be held liable for the negligence of the servant.

6. ——: —— : ——: **Owner's Acts Insufficient to Constitute Ratification of Chauffeur's Unauthorized Act.** The failure of an automobile owner immediately to discharge its chauffeur causing an injury by the negligent operation of the automobile at a time when he was not driving the automobile upon the business of his master, and a suggestion that the chauffeur consult with the owner's attorneys, etc., cannot be regarded as being any evidence of the fact that the owner ratified the conduct of the chauffeur in indulging in a joy-ride.

### ON REHEARING.

7. ——: —— : ——: **Evidence: Chauffeur's Unauthorized Use of Automobile: Owner Not Liable.** Where the evidence goes no further than to show that the chauffeur, after having the automobile turned over to him and after he had been taught by a demonstrator to run it, did take it out in the evenings practicing or learning to run it, etc., and it nowhere appears that the owner

knew of such fact, or that it was the duty of the chauffeur to take the machine out in the evenings when not upon his employer's business for the purpose of learning to run it or for any other purpose, it cannot be said that the chauffeur on the occasion of the accident was engaged in his master's business when the evidence is plain that he was then engaged in his own pleasure in taking a ride about the city.

8. ———: ———: ———: ———: Evidence Fails to Support Charge Owner Employed Unskilled Chauffeur. An auaomobile owner who employed a demonstrator to accompany the chauffeur for five days so as to teach him to operate the automobile in discharge of his duties, was not guilty of negligence in placing the automobile in the hands of its employee who was inexperienced and unskilled.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Thomas L. Anderson,* Judge.

REVERSED.

*Anderson, Gilbert & Hayden* and *M. U. Hayden* for appellant.

(1) The owner of an automobile who is not present at the time of an accident is not liable for damages caused by its alleged negligent operation by his employee unless, at the time, the employee is engaged in the performance of some duty pertaining to his employment and is acting within the scope of his employment. Slater v. Thresher Co., 107 N. W. 133, 5 L. R. A. (N. S.) 598; Lotz v. Hanlon, 66 Atl. 525, 10 L. R. A. (N. S.) 202; Danforth v. Fisher, 75 N. H. 111, 71 Atl. 535, 21 L. R. A. (N. S.) 93; Steffen v. McNaughton, 124 N. W. 1016, 26 L. R. A. (N. S.) 382; Hartly v. Miller, 165 Mich. 115, 33 L. R. A. (N. S.) 81; Tyler v. Stephan, 174 S. W. 790; Reilly v. Connable, 214 N. Y. 586, 108 N. E. 853, L. R. A. 1916A, 954; Symington v. Sipes, 88 Atl. 134, 47 L. R. A. (N. S.) 663; Healy v. Cockrill, 202 S. W. 229, L. R. A. 1918D, 155; Clark v. Buckmobile Co., 94 N. Y. Supp. 771; Reynolds v. Buck, 127 Iowa, 60, 103 N. W. 946; Whimster v. Holmes, 177 Mo. App. 130, 164

S. W. 236; Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854; Glassman v. Harry, 182 Mo. App. 304, 170 S. W. 403; Hayes v. Hogan, 273 Mo. 1, 200 S. W. 286; Whiteaker v. Railroad Company, 252 Mo. 438, 160 S. W. 1009; Bolman v. Bullene, 200 S. W. 1068. (2) In order to render the owner of an automobile liable for its negligent operation by his servant, it must appear that the latter was serving his employer at the time of the accident and in respect to the very transaction out of which it arose. Hartly v. Miller 165 Mich. 115, 33 L. R. A. (N. S.) 81; Symington v. Sipes, 88 Atl. 134, 47 L. R. A. (N. S.) 663; Healy v. Cockrill, 202, S. W., 229, L. R. A. 1918D, 155. (3) If a driver takes his employer's automobile without the knowledge or consent of the employer, and while using it for a purpose purely personal to himself, causes an injury to a third party, the employer is not liable. Slater v. Thresher Co., 107 N. W. 133, 5 L. R. A. (N. S.) 598; Lotz v. Hanlon, 66 Atl. 525, 10 L. R. A. (N. S.) 202; Steffen v. McNaughton, 124 N. W. 1016, 26 L. R. A. (N. S.) 382; Healy v. Cockrill, 202 S. W. 229, L. R. A. 1918D, 115; Clark v. Buckmobile Co., 94 N. Y. Supp. 771; Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854; Glassman v. Harry, 182 Mo. App. 304. (4) If an employee while using the automobile of his employer temporarily abandons the service, or at the time of an accident is acting for himself *pro tempore* and is using the automobile for his own individual purposes or pleasure, the employer is not liable for any damage caused at that time. Lotz v. Hanlon, 66 Atl. 525, 10 L. R. A. (N. S.) 202; Tyler v. Stephan, 174 S. W. 790; Resilly v. Connable, 214 N. Y. 586, L. R. A. 1916A, 954; Symington v. Sipes, 88 Atl. 134, 47 L. R. A. (N. S.) 663; Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854; Glassman v. Harry, 182 Mo. App. 304, 170 S. W. 403; Slater v. Thresher Co., 5 L. R. A. (N. S.) 598. (5) While proof of the ownership of an automobile and that the person driving it, at a certain time, is an employee of the owner

are sufficient *prima facie* to establish that the driver was acting within the scope of his employment at the time, that presumption disappears in the face of substantial or undisputed testimony that such driver was not acting within the scope of his employment at such time. Potts v. Pardee, 220 N. Y. 431, 116 N. E. 78; Cronecker v. Hall, 105 Atl. 213 (N. J.); Rose v. Balfe, 223 N. Y. 481; Lotz v. Hanlon, 5 L. R. A. (N. S.) 202; Guthrie v. Holmes, 272 Mo. 215; Glassman v. Harry, 182 Mo. App. 304. (6) An automobile is not an instrumentality so inherently dangerous as to render its owner liable in damages if he permits it to be used by his employee, even though the latter may be a reckless driver. Danforth v. Fisher, 75 N. H. 111, 21 L. R. A. (N. S.) 93; Jones v. Hoge, 92 Pac. 433, 14 L. R. A. (N. S.) 216; Cunningham v. Castle, 111 N. Y. Supp. 1057; Hall v. Compton, 130 Mo. App. 681; Daily v. Maxwell, 152 Mo. App. 415, 427-429; Lewis v. Amorous, 59 S. E. 338; Huddy on Automobile (2 Ed.), p. 33; 28 Cyc., p. 25. (7) The fact that McNamara may have taken appellant's automobile out after business hours on a prior occasion in violation of his instructions is not sufficient to charge appellant with the duty of assuming that he would again violate those orders and to exercise extratordinary precautions against his taking the machine out after night. and evidence that, on another occasion, McNamara had the automobile out after night was inadmissible to establish any negligence on the part of appellant. Labatt on Master & Servant, section 2222, pp. 6681-6690; Danforth v. Fisher, 75 N. H. 111, 21 L. R. A. (N. S.) 93; Clark v. Buckmobile Co., 94 N. Y. Supp. 771. (8) Evidence of statements or acts of the driver of an automobile, made or performed after an accident, is inadmissible for the reason that they do not form a part of the *res gestae.* It was prejudicial to the rights of appellant to admit evidence of anything done or said by McNamara at any time after his arrest following this accident. Stinger v. Metz Co., 171

Pac. 1032; Whitney v. Sioux City, 154 N. W. 497·
Gouin v. Ryder, 94 Atl. 670; Railroad Co. v. O'Brier
119 U. S. 99; Adams v. Railroad Co., 74 Mo. 556:
Pannell v. Allen, 160 Mo. App. 714, 142 S. W. 482:
King v. Insurance Co., 105 Mo. App. 163, 172-3;
Carson v. Stockyards Co., 167 Mo. App. 443, 151
S. W. 752. (9) It is error to give to the jury an
instruction which is broader than the averments of the
petition or than the evidence or which assumes that
the defendant is negligent in any respect. Hall v.
Coal & Coke Co., 260 Mo. 531, 168 S. W. 927; Green-
stein v. Foundry Co., 178 S. W. 1179; Mulloy v.
Painting Co., 214 S. W. 405; McDonnell v. Taxicab
Co., 168 Mo. App. 351, 151 S. W. 767.,

*Henry A. Baker* for respondent.

(1) The employer is liable for the negligent acts
of his employee performed in the course of his employ-
ment. Vanneman v. Walker Laundry Co., 166 Mo.
App. 685; Fellhauer v. Railroad Co., 191 Mo. App.
137; Slothower v. Clark, 191 Mo. App. 105; Hell-
rigel v. Dunham & Harvey, Etc., 192 Mo. App.
43; Perkins v. Railroad Co., 55 Mo. 214. (2) Mc-
Namara, the employee of appellant company, was at the
time of the accident, in evidence, acting within the
scope of his authority. This is determined by an ex-
amination of the evidence, and no authorities are
needed to establish that statement. (3) Both previous
authorizations of the acts of an employee and subse-
quent ratification thereof may be shrown by the subse-
quent conduct of the parties. Oglesby v. Smith, 38 Mo.
App. 67; Perkins v. Railroad Co., 55 Mo. 214; Title
Guaranty & Surety Co. v. Drenon, 181 Mo. App. 198;
Beagles v. Robertson, 135 Mo. App. 306; Plummer
v. Knight, 156 Mo. App. 321. (4) An automobile
in the hands of one who does not know how to run
it, in the hands of one who is not a skillful driver,
is a dangerous machine. No authorities are necessary

to support this proposition. (5) ''Persons using dangerous agencies are required to use the utmost care to prevent injuries and to adopt every known safeguard, and one who places in the hands of another or authorizes the use by another person of a dangerous instrument or article under such circumstances that he has reason to know it is likely to produce injury is liable for natural consequences.'' Cyc. of Law & Procedure, 460; Palm v. Ivorson, 117 Ill. App. 535; Eyermann, 7 Mo. App. 592. (6) The instructions for respondent were not too borad, as there was a good foundation in the evidence for every fact which was submitted to the jury to find. An examination of the evidence establishes this point. (7) Questions of negligence and of contributory negligence are primarily ·for the jury and only become questions of law where there is no dispute in the evidence, and but one inference can reasonably be drawn from them; but where the facts are disputed or the credibility of witnesses is in question or a material fact is left in doubt or there are inferences to be drawn from the facts proven, thme questions of negligence and of contributory negligence are for the jury. Murrel v. Smith, 152 Mo. App. 95; Vaughn v. Wm. J. Lemp Brewing Co., 152 Mo. App. 48; Oborn v. Nelson, 141 Mo. App. 428; Munro v. Railroad Co., 155 Mo. App. 710; Shamp v. Lambert, 142 Mo. App. 567; Turk v. Springfield Traction Co., 140 Mo. App. 335; Larrance v. Mo. Pac. Railroad Co., 141 Mo. App. 338. (8) Any person owning, operating or controlling an automobile running on, upon, along or cross public roads, streets, avenues, alleys, highways or places much used for travel, shall use the highest degree of care that a very careful person would use under like or similar circumstances, to prevent injury or death to persons on, or traveling over, upon or across such public roads, streets, avenues, alleys, highways or places much used for travel, etc. Laws of Missouri, 1911, p. 330, sec. 9.

BIGGS, C.—At about 10 o'clock on the night of August 18, 1913, Martin Kilroy, a mounted police officer of the City of St. Louis, while crossing what is known as the Kingshighway Viaduct a public through-fare in said city, was run into by an automobile owned by the defendant and operated by its employee Paul J. McNamara. The horse was struck by the motor car coming upon it from the rear, which caused it to be thrown forward and Kilroy was on account thereof hurled from his saddle to the pavement and was so severely injured that as a result thereof he died the following day.

The plaintiff is the widow of Martin Kilroy and sues for his alleged wrongful death, specifying that McNamara was negligent in several respects and on the occasion mentioned was employed by defendant and was operating the automobile owned by the defendant and at the time was acting within the scope of his authority as such employee.

The suit was filed against both McNamara and the Charles L. Crane Agency Company, but service was not obtained on McNamara, and pending the suit he died and no further action was taken against him.

After the verdict of a jury and a judgment in plaintiff's favor in the sum of $4750, defendant duly perfected its appeal.

Whether at the time of the accident McNamara was upon his master's business is one of the vital questions in the case. The defendant contends that there was no case for the jury, for the reason that the evidence failed to establish that McNamara was acting for the defendant at the time, and that consequently its peremtory instruction to find in its favor should have been given.

In order to determine this question it will be neces-sary to sift the evidence on the question of McNamara's authority and to determine whether or not there is substantial evidence in behalf of plaintiff which tends to show that McNamara at the time of the accident was, as a matter of fact, engaged in the performance

of a duty for the defendant. It is necessary that there be some evidence of such fact, or at least facts must be established from which a reasonable inference can be drawn that McNamara was acting at the time within the actual or apparent scope of his employment in order to call into action the rule of *respondeat superior*.

Under the rule laid down in Guthrie v. Holmes, 272 Mo. 215, l. c. 236-237, 198 S. W. 854, the proof of the employment of McNamara by the defendant and proof that defendant owned the automobile raised a presumption that McNamara at the time was acting within the scope of his employment and makes a prima-facie case, which however, vanishes upon the appearance of evidence of real facts to the contrary, and where these facts appear by defendant's evidence the duty is then cast on plaintiff to produce some evidence of the fact that McNamara was actually engaged at the time of the accident upon the business of the defendant.

The facts disclosed by plaintiff's evidence on this question are these: The defendant is an insurance company, and McNamara was its employee and acted as inspector and also adjuster and solicitor of business for the company. He had no regular office hours and would sometimes work in the evening. Defendant furnished him with a Ford runabout in order to aid him in the performance of his duties. After McNamara left the employ of defendant, his deposition was taken at Chicago by defendant, and plaintiff offered in evidence the cross-examination of McNamara. His testimony as to his duties and movements on the evening of August 18th, is as follows:

I was an employee of the defendant company on the 18th, of August, 1913, After that I was taken off a salary and put to adjusting losses on a fee basis, and there was not enough in it for me, and in January, 1914, I resigned. After the accident I was arrested and had a criminal trial. Mr. Bennett, Vice-president of defendant company, Mr. Guthrie and Mr. Scott came to see me at the police station. At the station

I turned over to them a package of papers, but before they left the station I was released on bond and they were returned to me. Mr. Bennett I think came up to see me to see what he could do for me. He knew about the accident, and I was not discharged immediately afte that. I did not, however, operate and·run the automobile afterward.

The Crane Agency Company writes fire, tornado, accident and health insurance. I acted as inspector and also as adjuster and solicited new business in all these different kinds of insurance in which the company is engaged. I had no regular office hours. Sometimes I would work in the day and sometimes I would work in the evening. Whether day or night I was looking out for some new customer or some new business. The machine that I was operating on the night of the 18th of August belonged to the Crane Agency Company. Nothing was said about my being limited to any particular time for running the automobile. I don't know whether Mr. Crane, the President, knew that I had never run an automobile before running this one. I don't think he said anything about it. Mr. Crane was president of the company. No other officer or director of the company asked me whether I had ever run an automobile before. The automobile was turned over to me without a thing being said as to whether or not I had the skill or ability or knowledge sufficient to run it. Mr. Crane asked me if I thought that I could learn to run it, and I told him I thought I could. Besides doing my regular work it was my business to learn to run the automobile and to run it during my work. It was my business at first to learn to run the machine. The company had discharged the manager's brother and the automobile was purchased for me to use in making collections for the company and in making adjustments and inspections. Nothing was said about whether or not I should entertain prospects or prospective customers in the automobile. That was a part of my work before I had the automobile. Before the accident I had been

running the automobile in the evenings, but I don't think the company knew about it until on the night of August 14th, when I had an accident which they afterwards knew about. After that accident the company did not forbid me from running the automobile at nights. There was nothing said to me about it at all. Mr. Crane was out of town, and none of the other officers said anything about it.

When I started learning to run this machine I was instructed by one of the Ford Company's demonstrators. He helped me four or five days. After that I ran it myself. When I began to run the automobile by myself I had the State license. I drove the automobile the whole time from whenever the license was delivered until the 14th day of August. After that I did not run the automobile again until the evening of August 18th. I had possibly ten days practice in operating the machine. I was not still learning to run that automobile. I was not practicing up. I do not mean to say that I had become a skilled driver in those few days.

Q. Now, Mr. McNamara, on that evening of August 18, 1913,, you had been out attending to some work for the company had you not? A. No, I had been to the garage, I think. Q. Had you not before that been out at work for the company that evening? A. I had come from the office, that is all. Q. I mean later than that? A. No. Q. Haven't you prior to this, made a statement that you were out on business for the company that night? A. The only business I was on was going towards home, and I stopped at a place and inquired about a risk of insurance. That was personal business though.

I also had Bernard O'Neil out that evening. I did not discuss any business of any kind with him. I did not go to see him that evening, I just met him. In the evening of August 14th I had another accident. I ran into the gate or cross-bar of the Frisco Railroad. I was going four or five miles an hour. The gate on the right hand side of the street when I was going south

was broken; the mechanism was broken and it was down and the gate on the left hand side of the street was up, with a red light on it, but no light on the gate on the right hand side of the street which was down. It being dark there I could not see very well and I judged from one gate being up that both of them were up and I did not see it until we got right on top of it. After that accident on August 14th I did not have the automobile out until the 18th of August, as it was laid up for repairs. On the evening of the accident I had with me in the machine Columbus Hudson, but did not have business relations with him and had never solicited from him any insurance.

On Re-direct Examination Mr. McNamara testified: After I left the office of the Crane Company the night of this accident the first man on whom I called was T. E. Burns. I was not trying to get any insurance from him; he just spoke to me about his sister-in-law wanting some insurance, and I got her name. I did not make any arrangement with him or anything. He told me about his sister-in-law- and said to go to see her, but I never saw her. It was no part of my duties as an employee of the Crane Agency Company to go to see Mr. Burns about this matter. I don't recall whether I discussed the subject of insurance of any kind with any of the parties whom I saw after I left Mr. Burns that night, but I hardly think so.

Q. Were you engaged in any work or business after you spoke to Mr. Burns on the night of the 18th of August, 1913, and until this accident happened connected in any way with the performance of your duties as special agent employed by the Crane Company? A. No. Q. Were you in the performance of any of the duties of your employment as a special agent of that company at the time this accident happened? A. No. Q. I believe you stated a while ago that earlier in the evening you had intended taking the machine to where you kept it. Where was the machine kept? A. 1579 Tower Grove avenue. Q. When was it you changed

your plan and concluded not to put the machine in? A. Well I don't suppose I had any plans. As I said, one of those fellows asked me to take him out for a little ride, and I did not have nothing to do— Q. When Mr. O'Neil asked you to take him home you did so? A. Yes. Q. And you took him for a ride before you took him home, did you? A. Yes. Q. And the same thing occurred when Mr. Hudson asked you to take him for a ride? A. Yes. Q. Was Mr. Charles Crane in St. Louis on the night of August 18, 1913? A. No.

None of the officers of the company knew that I had the machine out at the time of the accident.

Q. In the performance of your duties as special agent i nthe employ of the Crane Company did you or did you not do any inspecting or adjusting in connection with their accident or health insurance? A. No. Q. And if you solicited any accident or health insurance you were paid an extra commission for that? A. A commission yes. Q. Were you required by the terms of your employment to place any policies that you obtained by your own soliciting with the Crane Agency Company, or were you free to place it anywhere? A. It was understood, although there was nothing said about it, yet it was understood that we would place it there. Q. You stated that at the time you were arrested or a few days afterwards that you had some papers; I believe Mr. Baker asked you if they were not papers of the insurance company that were turned over to some one and later on you got them back. What were those papers? A. They were memoranda of where I was to go to inspect, and losses. Q. They were papers, in other words, that you obtained from the Crane Agency Company? A. For my work, yes. Q. And not from any insurance company? A. No, I don't recall. I might have had a policy there.

After that machine was turned over to me I was putting in all of the time I could apart from my work in learning to run it. I was learning it while I was working. While I was working and when I was through

with my work I kept that up. I not only practiced but I looked it over in the evenings.

McNamara further testified that at the time Mr. Bennett came to see him when he was arrested he told him that he should employ an attorney to look after his interests and referred him to Mr. Thompson, of the firm of Ryan & Thompson, who represented him. Ryan and Thompson were also attorneys for the Crane Agency Company, and that they never sent him a bill.

Columbus Hudson, who was in the automobile with McNamara at the time of the accident, testified in plaintiff's case in chief as follows:

I reside at 1532 Tower Grove Avenue. On the 18th day of August, 1913, I lived at 1608 Tower Grove Avenue in the same neighborhood. My occupation at the time was tending bar. I knew Paul J. McNamara. He came into the place where I was working quite often. On the 18th day of August, he had possession of an automobile which he kept in a shed at the yards of the Robinson Coal Company. On the day that the accident happened to Kilroy I saw Paul McNamara about 7 o'clock in the evening. I went out with him in the automobile after that. I guess it was about 7:30 when we left the place. It was a two passenger Ford automobile. We started from Tower Grove and Blaine Avenue. We went North on Tower Grove and then over to the Natural Bridge Road and then back to the park and through the park to Kingshighway and back over Kingshighway. Mr. McNamara operated the car all the way. He stopped on the way. The first place we stopped I believe was at Tower Grove and Clayton road That place was a saloon. We had a drink there and went on out and got in the machine again. He did not do anything else that I know of. I don't know whether we went in there to see anybody.

We stopped next at Natural Bridge and Vandeventer. There was a saloon there and McNamara went in I believe I had a drink and he took something

or other. I don't remember now just what he had. He didn't do anything else that I know of. I don't know whether he went in there to see anybody. We next stopped at a saloon at Vandeventer and Olive. We He just went in, got a drink and came out again. We next stopped at Kingshighway and Vandeventer. We got a drink and he asked for some party. I don't know who he was. Q. And what else did he do? A. He just asked for this party, and the gentleman behind the bar told him he had not been in that evening and did not know whether he would be in or not. Q. Now, in asking for that party did he do anything else? A. Well, he had some papers in his hand; I don't know what they were. Q. Where did he get those papers? A. Got them out of his inside coat pocket. Q. Took them out of his inside coat pocket? A. Yes, sir. Q. And asked for a man? A. Yes, sir. Q. Then what did he do after that? A. Oh, we went over Kingshighway onto the viaduct, and there is where we— THE COURT: Was the man there? Did he say anything to the man? A. No, he didn't see the man he asked for. Q. State where you were going after that? A. I didn't— no certain place. Never heard him say any certain place he was going; I don't know where he was going after leaving that last place. Q. But where actually did he go? A. Well, he went over Kingshighway onto the viaduct and there is where he hit Mr. Kilroy's horse.

On cross-examination this witness testified: Q. And on this evening when you finished your duties, you wanted Mr. McNamara to take you for a ride in his automobile and he did so? A. Yes. Q. And while he was taking you for this ride this accident occurred? A. Yes, sir. Q. At that time you were not connected in any way with the Charles L. Crane Agency Company were you? A. No, sir. Q. Not employed for that company? A. No, sir. Q. And did you know that there was such a company? A. Why I knew that he was working for them, yes sir, that is all. Q. You knew that from what he told you before? A. Yes, sir, that is

all. Q. Did you have any insurance? A. No, sir. Q. That was written through that agency, through the defendant company? A. No, sir.

This was all the evidence offered by plaintiff on the question. We have read carefully the evidence submitted by defendant in order to determine whether any of it strengthens plaintiff's case. On the contrary it seems to clearly establish the defense.

Mr. Crane, the president of defendant company, caused the automobile to be purchased for McNamara, and gave him his instructions. In a conversation with McNamara at the time of the purchase he said to him: "Now Mac, this machine is purchased for you for business purposes. If I hear of you using it at any time for any other purpose, any joyriding, you will be discharged. I want that distinctly understood. I am going away now and I don't want you using the machine for any other purpose than that. If you want, after you have learned to run it, to take your wife out of a Sunday afternoon you can do so, but outside of that I don't want you to use it under any other circumstances."

McNamara testified for defendant that he obtained the automobile on the afternoon of the accident from the repair shop, and went down town to the office of the Crane Company about 5:30 o'clock for the purpose of finding out what work he was to do the following day; that he remained at the office of the company about a half an hour and left in the automobile, saying nothing to anyone about having the machine; that he first went out to 4207 Race Course avenue to see Mr. Burns, whom he had known for several years; that he remained there about five minutes and then went to 1553 Tower Grove avenue to get some tools that belonged to the automobile, which was at the residence of Mathew Medley, and that he remained there possibly two or three minutes, leaving there a little after 7 o'clock; that when he left Mr. Medley's house he went to a saloon at Tower Grove and Blaine avenues, where he found Mr. Medley; that he remained at the saloon

about 10 or 15 minutes and then left, and as he was leaving he met his friend Bernard O'Neil, who he invited into the machine and took towards his home on Blaine avenue. Mr. O'Neil asked him to take him up to Grand avenue, which he did, and then he took him back home; that he then went back to see Mr. Medley again and stopped in the same saloon at Tower Grove and Blaine avenues for that purpose; that he remained at this saloon about two or three minutes on the second visit and then left, and as he was leaving met Columbus Hudson, whom he had known and who was a bartender; that Hudson asked him to give him a ride, which he did; that the two of them drove north to the Fair Grounds Park in the north end of the city; that they stopped at Natural Bridge and Vandeventer avenue to get some gasoline; that they arrived at the gasoline station about 9:15; that after getting the gasoline they went south on Grand avenue to Delmar or Washington, west to Vendeventer; south on Vandeventer to Tower Grove avenue, thence south on Tower Grove avenue to Tower Grove Park in the southern part of the city; thence west through the park to Kingshighway boulevard and then turned north on Kingshighway and went over the viaduct where the accident happened.

The witness further testified that Mr. Crane had gotten a small car and told him that the reason he did so was on account of the fact there was to be no joy-riding; that he did not want any joy-riding, as he called it.

McNamara nowhere testified that while at the office on that day he got any papers pertaining to the company's business. It is nowhere shown what papers McNamara took from his pocket at the saloon on Kingshighway and Vandeventer avenue, and it is not shown anywhere who the man was he inquired about at the saloon, or whether it was about any business of the company. It does appear that the next day at the police station McNamara turned over to Mr. Bennett certain papers, which were shortly thereafter returned to McNamara, and McNamara says these were memo-

randa on slips of paper showing where he was to make inspections, and there may have been among the papers a policy.

Respondent contends that from this incident of the papers as shown by the evidence, the inference can be drawn that at the time McNamara went into the saloon at Kingshighway and Vandeventer and inquired for a man and took from his pocket certain papers, that McNamara was then engaged upon his master's business, and that inasmuch as McNamara then proceeded north over the Kingshighway viaduct where the accident happened, that he was then still upon an errand for the master. It doesn't appear in the evidence that McNamara actually took any papers from the office of the company which pertained to the business of the company. We must infer that McNamara had papers of defendant in his pocket pertaining to the master's business, and we must next infer that the papers he removed from his pocket in the saloon referred to and inquired for a man were papers pertaining to the master's business, and further that the man inquired for was some man who may have had business relations with the defendant company. The incident which occurred at the police station the next day where McNamara turned over to Mr. Bennett a package of papers, cannot aid the plaintiff, for it does not appear that these were the same papers or that they were papers that pertained to the business of the defendant other than that they were memoranda that McNamara had about places where he was to make inspections. An inference must be drawn from facts and cannot be based on another inference. Likewise a presumption cannot be based on a presumption but must arise from facts.

But assume that these inferences can be reasonably drawn from the evidence, and that McNamara received papers pertaining to defendant's business from the office in the afternoon and that when he arrived at the saloon on south Kingshighway about 9:30 that night he asked for a man and at the same time took the

same papers from his pocket, and assume that the papers pertained to defendant's business, and that the man he inquired for had business relations with the defendant, still it does not follow that thereafter when proceeding northward over Kingshighway where the accident occurred that McNamara was still engaged upon his master's business. After all these assumptions and speculations are made from the evidence the conclusion is irresistible that thereafter McNamara proceeded upon a mission that was purely personal, and even if he did at the saloon attempt to transact some business for his master, he thereafter resumed the entertainment of his friend Hudson. It is uncontradicted that after failing to find the man he inquired for at the saloon he replaced the papers in his pocket and nothing further was said about the matter, and that he and Hudson then left the saloon and proceeded upon their pleasure trip northward over the Kingshighway viaduct. It could not possibly be said that McNamara thereafter having finished the business for his master was upon his way home.

After this last· visit to the saloon where the paper incident took place, McNamara and Hudson did not proceed towards home which was in the 1500 block on Tower Grove avenue, but went practically in the opposite direction. The home of McNamara and the saloon referred to are both on the south side of the Kingshighway Viaduct which crosses Mill Creek Valley. If McNamara was thereafter homeward bound he would have proceeded a short distance eastwardly on Vandeventer avenue to Tower Grove avenue, and then south to the garage. Instead of that he went north over the Kingshighway Viaduct, which clearly indicates that he was proceeding on his pleasure trip with Hudson.

Prior to this incident in the saloon it is plain that McNamara and Hudson were simply indulging in a personal pleasure trip over the city, stopping at various saloons for refreshment. They were first in the south part of the city, and they went to the north end of the

city, and then again returned to the south end and proceeded through Tower Grove Park to Kingshighway, and then came back north over Kingshighway. At no time was he upon any business for the defendant between the hours of 7 o'clock and 9:50 o'clock—the time of the accident.

Under such circumstances we must hold that under the law of this State McNamara at the time was not driving the automobile upon the business of his master, but was engaged upon a purely personal errand for his own pleasure. [Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854; Glassman v. Harry, 182 Mo. App. 307, 170 S. W. 403; Whimster v. Holmes, 177 Mo. App. 130, 164 S. W. 236; Bolman v. Bullene, 200 S. W. 1068 (not yet officially reported).]

Respondent argues that the defendant company ratified McNamara's conduct by not immediately discharging him. The evidence shows that while McNamara remained in defendant's employment for a short time after the accident he was never again permitted to operate the automobile. It is further contended that the fact that Mr. Bennett suggested to McNamara after the accident that he consult with the firm of attorneys who had done business for the appellant company, that this is evidence of ratification of McNamara's conduct. We do not regard these two facts as being any evidence of the fact that defendant ratified the conduct of McNamara in indulging in a joy-ride on the evening of the 18th of August.

We conclude from the foregoing that at the time of the accident the employee McNamara was not engaged upon the master's business in driving the automobile, but on the contrary was upon a journey exclusively his own. Under such circumstances the authorities uniformly agree that the master cannot be held liable for the negligence of the servant.

The demurrer to the evidence should have been sustained. The Commissioner therefore recommends that the judgment is reversed.

PER CURIAM:—The foregoing opinion of BIGGS, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed. *Reynolds, P. J,. Allen* and *Becker, JJ.,* concur.

## ON REHEARING.

BIGGS, C.—In a motion for rehearing plaintiff's counsel urge that we have overlooked certain features of the case. He errs in this, as we gave full consideration to every angle of the evidence in order to determine whether the judgment could be upheld.

## I.

It is contended that an inference can be drawn from the evidence that McNamara at the time of the accident was learning to run the automobile and that this was a part of his duty to his master, and therefore the case was for the jury. We cannot agree  with counsel's contention. In the first place, the evidence goes no further than to show. that McNamara after having the automobile turned over to him and after he had been taught by a demonstrator to run it, did take it out in the evenings, and as he says "was practicing" or learning to run it. It no where appears that the defendant knew of such fact or that it was the duty of McNamara to take the machine out in the evening when not upon his employer's business for the purpose of learning to run it or for any other purpose. The master furnished a teacher for that purpose, who rode with McNamara for five days, and McNamara thereafter ran the machine himself for about ten days. It seems that it would be going beyond the pale of reason to say under the facts of this case that McNamara on the occasion of the accident was engaged on his master's business, when the evidence is plain that he was then engaged upon his own pleasure in taking a ride about the city with his friend Hudson.

## II.

As in his original brief, counsel says that the defendant ratified the act of his employee McNamara, because an officer of defendant company called on McNamara at the jail where he was confined, and suggested that he employ counsel who were the company's lawyers, and further because the defendant did not thereafter discharge McNamara.

In the first place, plaintiff did not sue upon the theory of a ratification by defendant of an unauthorized act of its employee, but on the theory that the agent was in fact authorized and acting for the master at the time of the accident. But outside of this certainly the mere fact of the officer of the defendant company recommending to McNamara who was in jail that he employ certain counsel who happened to be counsel for the defendant should not be held to be a ratification of the unauthorized act of McNamara in taking a joy-ride for his own pleasure at the time of the accident. While defendant did not discharge its employee after the accident, it is undisputed that he was never thereafter permitted to run the automobile. Such circumstances could not constitute a ratification.

Perkins v. Railroad, 55 Mo. l. c. 214, relied on by plaintiff, is not an authority on the proposition under the facts in this case. That was a case of a malicious act of a conductor in wrongfully ejecting a passenger from the train. After the wanton acts were committed, the company still retained the servant as a conductor. The Court held in such a case punitive damages were recoverable, and that the fact that the conductor was retained in the employ of the defendant afterwards would be construed into a ratification of his malicious act.

## III.

Counsel say that we overlooked an assignment of negligence to the effect that defendant placed in the

hands of its employee who was inexperienced and unskilled an automobile and turned him loose on the streets to learn to operate it without any restrictions upon him or without any supervision over him, and that such automobile under said circumstances is a dangerous instrumentality, and that on account thereof defendant should be held liable.

Granting for argument sake that such acts may constitute negligence, the evidence in the case does not support the charge. Instead of being guilty of the said act of negligence, the record discloses that the defendant as heretofore stated, caused the demonstrator to accompany McNamara for five days so as to teach him to operate the automobile.

It is therefore recommended that the motion for rehearing be overruled.

PER CURIAM:—The foregoing opinion of BIGGS, C., is adopted as the opinion of the Court. Respondent's motion for rehearing is accordingly overruled. *Reynolds, P. J,. Allen* and *Becker, JJ.,* concur.