HUNTER v. FIRST STATE BANK OF MORRILTON.

Opinion delivered May 26, 1930.

*Edward Gordon, J. S. Utley* and *Wm. T. Hammock,* for appellant.

*E. A. Williams* and *W. P. Strait,* for appellee.

HART, C. J., (after stating the facts). As suggested by the circuit court in directing a verdict for the defendant, the first impulse of nearly every one would be in the circumstances of the case to find for the plaintiff; but, under the well-established principles of law heretofore decided by this court, this cannot be done.

The suit is predicated upon the theory that the facts called for the application of the doctrine of *respondeat superior,* which rests upon the proposition that, in doing the acts out of which the accident arose, the servant was representing the master at the time and engaged in his business. It is conceded that the doctrine cannot be invoked unless, at the time of the negligent act causing the injury, the servant was engaged in performing a service for the master or incidental thereto. It is generally stated by text writers and in judicial decisions that the test of the liability of the master for his servants acts is whether the latter was at the time acting within the scope of his employment. The phrase "in the scope of his employment or authority," when used relative to the acts of the servant, means while engaged in the

service of his master or while about his master's business. It is not synonymous with "during the period covered by his employment."

In the application of the rule in *Sweeden* v. *Atkinson Improvement Co.*, 93 Ark. 397, it was held that a master was civilly liable for an injury caused by the negligent act of his servant when done within the scope of his employment even though the master did not authorize or know of such acts or may have disapproved or forbidden them. It was further held that a master is not liable for an independent, negligent or wrongful act of his servant done outside of the scope of his employment, and that the act of a servant for which his master is liable must pertain to something that is incident to the employment for which he is hired, and which it is his duty to perform or do for the benefit of the master.

Again, in *Wells Fargo & Co. Express* v. *Alexander*, 146 Ark. 104, it was held that the test of a master's liability for his servant's tortious acts is not whether they were done during the existence of the servant's employment, but whether they were committed in the prosecution of the master's business, and pertained to the particular duties of the servant's employment.

In the later case of *American Railway Express Co.* v. *Mackley*, 148 Ark. 227, a review was made of all our earlier decisions on the subject. The court declared that the established rule to be in this State that the test of a master's liability for the act of a servant is not whether a given act was done during the existence of the servant's employment, but whether it was committed in the prosecution of the master's business. This rule has been recognized and applied by this court in a suit for damages against the owner of an automobile for injuries sustained by a third person on account of the negligence of the chauffeur.

In a case note to 32 A. L. R. at page 1398, it is said that it is the well-established general rule that an owner of an automobile is not liable for an injury or

for damage resulting from the negligent operation of his car by his employee while the latter is using it for his own purposes without the owner's permission or consent, since, to hold the latter liable, the relation of master and servant must exist at the time, and the act must be within the scope of the servant's authority. Among the numerous cases cited is *Healey* v. *Cockrill*, 133 Ark. 327.

The same rule is laid down in a case note to 45 A. L. R. 478, and among the cases cited in support of it is *Bizzell* v. *Hamiter*, 168 Ark. 476. To the same effect, see *Crowell* v. *Duncan*, 145 Va. 489, 134 S. E. 576, 50 A. L. R. 1425; and the case note to 50 A. L. R., page 1450.

In the case note to 22 A. L. R. at page 1419, it is said that the owner of the automobile is not liable where the employee, furnished a car for business, uses it for his own purposes.

In the application of the rule in *Slater* v. *Advance Thrasher Co.*, 97 Minn. 305, 5 L. R. A. (N. S.) 598, 107 N. W. 133, it was held that where a company furnished one of its agents with an automobile for his own use in expediting its business, and the agent, after business hours, used the automobile for his own purposes, not connected with the master's business, the company is not liable for an injury resulting from the agent's negligence, since such use of the automobile was not within the scope of the agent's employment. To the same effect see *Mullia* v. *Ye Planry Building Co.*, (Cal. Ct. of Appeals) 161 Pac. 1008; *Martinelli* v. *Bond*, (Cal. Ct. of Appeals) 183 Pac. 461; *Solomon* v. *Commonwealth Trust Co.*, (Penn.) 100 Atl. 534; and *Kilroy* v. *Chas L. Crane Agency*, 203 Mo. App. 302, 218 S. W. 425.

So it will be seen that the test of the owner's liability for the negligence of his employee in injuring the property or person of third persons while driving the former's automobile is the nature of its use at the time of the accident, whether or not it is being used in the transaction of the business of the owner of the auto-

mobile. The very basis of the rule of *respondeat superior*, as applied to automobile accidents as well as to other cases, is that the driver of the car is acting for the owner and not for himself personally at the time of the accident. When the servant steps outside of the master's business and enters upon the performance of some individual purpose of his own, he ceases to act as the servant of the owner, and the latter's responsibility for his act terminates.

This brings us to a consideration of whether Ferrell, at the time of the accident, was acting within the scope of his employment, and this involves an inquiry into the contract of his employment, and the relation of his acts at the time of the accident to the services he actually performed pursuant to his employment.

According to the testimony of Luther Finch, he got in the car of the defendant with Frank Ferrell on Sunday evening for the purpose of going across the Arkansas River near Morrilton to look at a cow on the farm of Emmett Mitchell, Finch agreed with Ferrell about the price of the cow, and gave him a check payable to Emmett Mitchell. When they got back to Morrilton, Finch got out of the car, and Ferrell went on to the house of a neighbor, and stayed for a short time. He then left in the car and went on home and ran over and injured the plaintiff and her husband by his negligent driving on the way there.

According to the testimony of R. L. Deal, he was vice president and cashier and managing officer of the First State Bank of Morrilton, Arkansas, and represented the Bank Commissioner in the collection of some old debts due the Bank of Morrilton. During the fall of 1927, he hired Frank Ferrell to act as chauffeur for Dr. Oates and Joe Irving who were employees of the bank, and who were engaged in driving about the country and collecting the assets of the Bank of Morrilton for the First State Bank. Frank Ferrell, being familiar with the people and being a good judge of stock, was

employed to act as chauffeur to Dr. Oates and Joe Irving. In addition to driving the car, he had no duties except to assist them in collecting stock or in advising them as to the value of the same when called upon to do so. He was paid at the rate of $10 per week, and was not required to work on Sunday. He had no authority to sell the property or assets of the bank. Ferrell had no authority to use the car or to have it out at all on Sunday; the duties of his employment did not require him to work on Sunday, and none of the bank officers knew that Ferrell did perform any work on Sunday for the bank. Each day's work was routed in advance. Sometime Dr. Oates and Joe Irving would permit Ferrell to take the car home and keep it overnight. They allowed him to take the car home on the Saturday evening before the accident occurred, and he was to keep it until the next Monday morning in the garage at his home. The officers of the bank did not know that he was using the car on the Sunday that the accident occurred.

The testimony of Deal was corroborated in all respects by that of Frank Ferrell.

According to the testimony of Joe Irving, when the car was not in use, it was presumed to be kept at night in his garage, but when Ferrell and he would come in off a trip, Ferrell would sometimes drive him home and he would permit Ferrell to take the car to his home and keep it in his garage until it was used again on the business of the bank. Thus, it will be seen that Ferrell did not have any authority to use the car for his own purposes, and the bank did not know that he was using the car on the Sunday that the accident occurred. He had been driving around the country with a friend for pleasure, and then took Finch in the car for the purpose of selling him a cow that belonged to Emmett Mitchell. It is true that Mitchell was a director of the bank, but the bank did not have any interest whatever in the cow and was not interested in the sale of her. Hence it cannot be said that Ferrell was acting within the apparent scope

of his authority in using the car for the purpose of carrying a prospective customer to look at a cow belonging to Emmett Mitchell. The officers of the bank did not know that Ferrell was using the car on Sunday, and did not give him permission to do so. He was not required to use it in the performance of his duties to the bank. It is true that there is testimony tending to show that he was allowed to keep a pair of the mules and a cow belonging to the bank on his own premises and to sell them, but this was not done on the Sunday the accident occurred, and he was given specific instructions in the matter. He did not use the car in the performance of any business entrusted to him by the bank on the Sunday in question. He had also been given permission to keep and sell a cow of the bank, but the permission to sell a cow or pair of mules for the bank had no relation to his authority to sell a cow for Mitchell.

The only ground upon which the defendant could be held liable was that an automobile is such a dangerous instrumentality that the owner of it must be deemed responsible for the tortious act of his servant in driving it, whether that act was done in the performance of the master's business or regardless of the fact of whether the master had knowledge of it. We think such a rule would be contrary to the principles of law already decided by this court. If the master is not liable for the tortious acts of the servant when he deviates from his employment for his own business or pleasure, with equal reason the master should not be held liable where the employee is furnished a car for business use, and takes it out of the garage without the master's consent and uses it for his own purpose. The rule of law applicable to the care and protection of dangerous instrumentalities does not apply as will be clearly seen from the rule laid down in *Healey* v. *Cockrill*, 133 Ark. 327, and *Bizzell* v. *Hamiter*, 168 Ark. 476, and *Keller* v. *White*, 173 Ark. 885. Ferrell, in driving the car around on the Sunday of the accident, was using it for purposes of his own, and his

act in so doing had no relation to his services as chauffeur for the bank, and the latter's immunity to liability is settled by the principles of law above announced.

The evidence on this breach of the case is undisputed; and in the application of the rule of law decided and applied herein there was no question of fact to be submitted to the jury. The rights of the plaintiff to recover depended wholly upon the law as declared by the court, as applied to the undisputed facts. Having reached the conclusion that the owner is not liable for the tortious act of his servant in injuring the person or property of third persons where the servant is not using the car for the performance of the business of the owner, but is using it wholly for his own purposes, there is no question of fact to submit to the jury.

Therefore the judgment will be affirmed.