PICKENS *v.* WESTBROOK.

4-3917

Opinion delivered June 17, 1935.

*House, Moses & Holmes* and *Harry B. Solmson, Jr.,* for appellant.

*Chas. Q. Kelley, Sam Rorex* and *John L. Carter,* for appellee.

BAKER, J.   Arch Pickens was operating the McGehee Hotel Coffee Shop and G. G. Woods was employed by him as watchman whose duties required him to remain at or near a door through which employees of the hotel and coffee shop entered or left the building.  It was the duty of the watchman to see that employees upon entering the hotel registered by punching a time clock, and not to permit them to carry packages from the hotel upon leaving without having an O. K. or some mark of approval showing that the package had been investigated and inspected by some one in charge.  This watchman performed the same duties for the hotel and for the coffee shop.  The appellant here had the coffee shop under a lease and operated it as his own business to the exclusion of the hotel management.  At certain times of the day it was the duty of Woods to operate an elevator for the carrying of freight in the hotel building.  Near this rear door, used as an entry and exit by the employees, Woods had a chair and desk, and, except while operating the elevator, kept check upon the employees as they might enter or leave the building.  Outside of this back passageway was a receptacle for trash referred to as the trash barrel.

On August 15, 1934, a negro, Stewart, employed by Pickens, attempted to leave the rear door when he was stopped by the watchman who advised him that it was

his duty to be at work for Mr. Pickens and closed the door, refusing to permit the negro to leave. The negro gave as his excuse that he was going to the trash barrel. Woods shut the back door refusing to allow Stewart to pass, and thereupon a controversy arose between him and the negro.

Stewart assumed a somewhat threatening attitude, but turned and went back downstairs to the place where he had been working, in or around the kitchen. Woods, being angry, followed the negro down the stairway, whereupon Stewart seized a bottle, and finally a cleaver with which he faced Woods assuming an air of defense. Woods left the basement of the hotel, and, instead of returning to his place of employment, went across the river to North Little Rock where he procured a pistol, and with it returned to the hotel. Having armed, he went to the boiler room in the basement following or hunting Stewart. Upon entering the boiler room he found or saw the appellee, Ed Westbrook, who was standing near the engineer's desk reading a paper. The engineer, Johnson, upon observing Woods' highly nervous state, seized him by the arm, but not in time to prevent the firing of two shots. These struck the appellee, inflicting flesh wounds through the thighs.

The appellee, though not dangerously wounded, was quite painfully so, and by reason thereof was confined to the hospital for fifteen days and at his home for a short time, and was unable to work for another thirty days. He sued Pickens and recovered a judgment for $1,200. The appeal is from this judgment.

Several questions are presented upon this appeal for our determination. The first one of these challenges the sufficiency of the evidence to support or sustain the judgment. If that be settled in favor of the appellant, the other questions pass out of the case.

Stewart, the employee with whom Woods had the controversy, was not called as a witness.

Plaintiff's testimony related rather to the extent and effect of the injuries than to matters showing the liability of the appellant therefor. He did, however, testify that Stewart had worked at the coffee shop for about a

year, and that silver and sandwiches had been missing, and Stewart was suspected. But a short time prior to the shooting, Mr. Pickens had called a meeting of his employees, and discussed with them the fact that petty thievery had been going on, and it would have to stop; advised the employees that he had instructed Mr. Woods to stop any one who was leaving the building and to see that any packages that employees were carrying had an O. K.; that Woods had the authority to stop any one who was taking property from the coffee shop.

Mr. Johnson testified that Woods' duties were to stop any one who was taking packages out of the building without an O.K., and explained that Woods' desk was about fifteen feet from the rear door and a short distance from the stairway that leads down into the coffee shop and boiler room in the basement; that a garbage barrel was kept in another room near the one where Woods' desk was located.

Johnson was an eye-witness to the shooting. The shooting took place in the boiler room where the employees went to get drinking water. Woods came into this boiler room and was very nervous; that Stewart had just run into the room and had hidden himself behind a switchboard. His opinion was that Woods accidentally shot Westbrook; that Woods was so highly nervous and jerky that he could hardly walk.

Pickens testified that Woods watched his employees in return for which he gave Woods his meals. William Stewart had been employed as a kitchen helper. He had at one time caught Stewart selling sandwiches to the boys in the barber shop, and had discharged him; that he had lost some silver from the coffee shop. He said also that he had meetings once or twice a month with his employees to discuss methods of improving the service and preventing loss of property. He had authorized Woods to stop his employees to see that they did not carry out packages that had not been O.K.'d. He did not tell Woods specifically to do anything when an infraction of the rules occurred. He had not authorized Woods to carry or have a gun or pistol on the premises. He did not know that he had one. He had known

Woods for about ten years; that he believed him to be about 70 or 75 years of age; that he was a very good man but of nervous temperament. He knew that Woods had a gun at his home. Woods' job was to drive the elevator and watch the employees of the hotel and see that they did not carry out packages not properly marked.

Jennings, called as a witness of the defendant, testified as follows: That Woods' duties were to watch the employees. He was supposed to see that all packages were O. K. If not, he was supposed to take the package and get an O. K. from the proper department. At the noon hour he relieved the elevator operator and worked from 11 to 12. Asked if Woods was authorized to have a pistol or gun, he said: "No, the duties he performs is not of a serious nature. Any employee that should want to resist giving him a package or letting him inspect a package, he could notify me. That position does not require any one to have a pistol." His duties were to watch every one passing through the back door.

Woods' explanation of the altercation is this: "Well, Stewart came upstairs, I had instructions from Mr. Pickens. I had charge of the help while they were on duty. They had no business going out to the back alley or going out the back door. I was standing there and I said, 'Where are you going, Red,' and he said, 'I am going out here to this trash barrel.' I said, 'Don't Mr. Pickens need you downstairs?' And he said, 'I want to look through this trash barrel.' I put my hand up to shove him back and went to shut this door. One door was shut; went to shut the other, and he drew back his fist and said, 'White man, don't do that.' He turned around and went downstairs, and I followed him downstairs. When I got downstairs, he was talking to Westbrook. Stewart didn't see me and Westbrook told Stewart I was coming. Stewart walked around in front of the range and he picked up a coke bottle and put it in his pocket. Made the remark that 'Am not going to let him do anything to me.' He went further and went by the block and picked up a cleaver and turned around and faced me with it. I started toward him and he had that cleaver, and he laid it down and picked up four beer

bottles and drew the beer bottles back. I was no match for the young negro with the bottles, and I turned around and went and got my gun and went down there.'' He further stated that he did not allow any employee to leave the building without proper O. K., and if there was no proper O. K. they could not leave without it.

The foregoing is the effect of all testimony relative to the duties of Woods. He was charged with the duty of observing the employees upon entering or leaving the building. He could refuse permission to take packages out of the building, stop any employee who had a package that had not been O. K.'d by the department from which it had been taken from the hotel, or from the coffee shop. Pickens had explained this to his employees. They knew they did not have the right to go through this passageway to the outside while on duty, and particularly they had no right to carry packages out without obtaining consent so to do from the department from which they were taken.

Stewart had attempted to pass through this door, was prevented from doing so by Woods who closed the door. Both Stewart and Woods became angry. Stewart returned to his place of work downstairs in the kitchen. Woods left his post of duty and followed to the basement. Woods had no duty to perform in the coffee shop, boiler room or other parts of the basement, so far as this record discloses. He had pursued Stewart to renew the difficulty which had occurred upstairs; Stewart assumed a defiant attitude and Woods became more enraged.

Instead of returning to his proper place and assuming the discharge of his duties, he left the hotel and armed himself and returned to the hotel but not to a resumption or discharge of his duties. He went on a hunt for Stewart in the basement. He followed Stewart to the boiler room where he had hidden himself behind a switchboard. In his highly nervous and agitated condition he shot the appellee. Neither the manager of the hotel nor coffee shop had any information of the impending trouble.

Was there any liability of the appellant for this unjustifiable conduct of Woods?

Ordinarily, it happens, the answer would be by the verdict of a jury, but in matters when there can be no dispute as to the testimony, or the value or effect thereof, or where reasonable minds must reach the same conclusions from the stated facts, the court should declare the legal effect. *Rock Island Plow Co.* v. *Rankin Bros. and Winn,* 89 Ark. 24, 115 S. W. 943; *St. L. I. M. & Sou. Ry. Co.* v. *Coleman,* 97 Ark. 438, 135 S. W. 338; *Maney* v. *Dennison,* 110 Ark. 571, 163 S. W. 783; *Am. Cent. Ins. Co.* v. *Noe,* 75 Ark. 406, 88 S. W. 572; *Mifflinburg Bank* v. *Kuhn,* 161 Ark. 411, 256 S. W. 370; *Fowler* v. *Hammett,* 162 Ark. 307, 258 S. W. 392; *C., R. I. & P. Ry. Co.* v. *Daniel,* 169 Ark. 23, 273 S. W. 15; *Barnes* v. *Hope Basket Co.,* 186 Ark. 942, 56 S. W. (2d) 1014.

A discussion by this court of the proposition of the servant's conduct and the liability of the master therefor, applicable to the facts above is found in *American Ry. Express Co.* v. *Mackley,* 148 Ark. 227, 230 S. W. 598. If the servant, at the time of inflicting the injury, was acting within the scope of employment, or apparent scope thereof, and such injury was proximately the result of some wrongful or negligent act, the improper conduct is attributable to the master. This is true, although the servant acted in wilful disobedience of orders or prescribed rules of conduct; but if, on the other hand, in disregard of the duties of his employment, he leaves his employer's business, though momentarily, and engages in enterprises that are wholly his own, and, while so engaged in accomplishing such individual desires or objectives, he wrongs another, he alone is responsible.

One of our best considered cases, in which the rule is most clearly announced, is the Mackley case, *supra.* The rule, however, is uniform, as may be determined by the following authorities: *Bryeans* v. *Chicago Mill & Lbr. Co.,* 132 Ark. 283, 200 S. W. 1004; *E. L. Bruce Co.* v. *Yax,* 135 Ark. 480, 199 S. W. 535; *Sweeden* v. *Atkinson Imp. Company,* 93 Ark. 397, 125 S. W. 439; *Hough* v. *Leech,* 187 Ark. 719, 62 S. W. (2d) 14. The above announcement of the law has been uniformly followed by this court. We think it sound in principle, and from this rule there should be no deviation.

In observance of the principles in the cases cited, but one conclusion can be reached. Woods, in the fit of anger, was attempting to punish Stewart for the insult and wrong of which he found himself the outraged victim. He was not trying to right any wrong done to his employer, but was attempting to satisfy himself by punishing Stewart, who had so grievously outraged his dignity. No doubt, he thought Stewart had been insolent to him, who, no doubt, had been accorded respect and veneration by others. One witness says he was about 75 years old, a good man. It does not appear that the belligerent tendency displayed by Woods was any part of the qualifications causing him to be employed by the appellant. His employment did not call for any show of force or authority, and it does not appear from any evidence that it was expected of him by either his employers or their employees.

Woods' conduct, the basis of the complaint, was wholly his own, entirely dissociated from any duty he was required to perform under his employment. This may be stated after indulging every reasonable inference that may be drawn from all the proof.

The conclusion must be reached from the authorities above cited, and, on account thereof, there was no liability of the appellant.

The court erred in not directing a verdict for the defendant. There has been a full development of all issues upon the trial in the circuit court.

The judgment of the circuit court is therefore reversed, and the cause is dismissed.