CARTER TRUCK LINE *v.* GIBSON.

4-5010

Opinion delivered April 4, 1938.

*Barber & Henry,* for appellant.

*V. D. Willis, W. S. Walker* and *J. Loyd Shouse,* for appellees.

BAKER, J. Russell Carter appeals from a judgment rendered against him in the Boone circuit court. Carter was operating some trucks out of Mountain Home, Arkansas. He employed two truck drivers, Chunk Woods and Clarence Vickery. About 6:30 o'clock, on the evening of July 17, 1937, Vickery, in driving one of the trucks north of Mountain Home, ran into a buggy, driven by Tom Gibson and his son, Neal Gibson. In this accident Tom Gibson was killed. Ida Gibson and her children, the appellees, sued Russell Carter on account of this accident. This suit resulted in a verdict of $10,000 against Carter, and from the consequent judgment is this appeal.

The question for determination is one of liability. There is no real dispute as to the facts. Some of the facts may perhaps be best told in the language of the witnesses, though a narrative statement in regard to most of them is sufficient.

Although Clarence Vickery was the driver of the truck at the time of the accident in which Tom Gibson was killed, by reason of Vickery's negligence he was the principal witness called to testify for the plaintiff against his employer, Russell Carter. According to his testimony the trucks were kept near a restaurant owned and operated by Mrs. Carter and this restaurant was used as an office for the truck business. The drivers ate at the restaurant and remained there in call so that they could be had at practically all times. On the morning of the day of the unfortunate accident, Carter claims that he discharged Vickery on account of his drinking, but Vickery denied this fact, and, for the purpose of this ap-

peal it may be said that the jury has found according to Vickery's contention; that is, that he was still employed by Carter, or, at least, had not been discharged at the time the accident occurred late that afternoon. Vickery testified that Carter was present in the afternoon when he, Vickery, was ordered by Woods, the other truck driver, to take one of the trucks and go to a saloon, known as Three Brothers, near the Missouri line, and get two bottles of gin, for the purchase of which, he testified, Woods gave him $2. He does not say that Carter knew that he had been so ordered by Woods to make this trip. When asked about the authority of Woods to give him orders, Vickery, speaking of Carter, said: "Well, he went to the hospital at St. Louis and he told me to do whatever Chunk told me to do while he was gone." This accident did not occur during Carter's absence at the hospital, but after his return, and, as an inference most favorable to the appellee, it may be presumed from all of Vickery's testimony, we think, that Woods continued to give orders or direct Clarence Vickery in the matter of the performance of his work, or in the discharge of his duties as a driver for Carter.

During the trial of the case, appellees referred to him as a vice-principal for Carter. It makes little difference, however, what they called him, as it was shown, at least inferentially, by Vickery's testimony, that Woods, though a truck driver, was acting as a general agent for Carter, with full power to direct and control Vickery in the discharge of his duties.

Although Vickery testified to the one instance only in which he was told by Carter to take or accept orders from Woods in the conduct of the business, he does state that this method of operating the truck line was continued and being followed at the time Gibson was killed, and Vickery gave as the reason for his having made the trip in the truck to get the gin the fact that he was ordered by Woods to do so. He said that he was working for Carter at the time; that immediately before leaving Carter's cafe, Chunk Woods was there at the cafe. When asked if Carter was present at that time he answered: "I don't know for sure, but I believe he was."

He makes this statement about his order: "I was sitting in Carter's Cafe at a table with Chunk Woods and he handed me $2 and told me to go to the line and get two pints of gin and bring back to him and I went up there and got them." This was injected in connection with the trip. "Q. When you got up there did you buy the two pints of gin? A. Yes, sir. Q. What else did you do? Did you do anything for the truck line? A. I got 10 gallons of gas. Q. Did you have it charged to Mr. Carter? A. Yes, sir. Q. Did you drive on back? A. Yes, sir." Another question later on and answer set forth as pertinent are: "Q. I believe you said you were working for the company when you went up there that afternoon? A. Yes, sir."

There was further examination about how much was saved by buying gasoline in Missouri rather than purchase it in Arkansas where the tax was higher.

He testified further to the fact that upon his return trip he struck the buggy driven by Tom Gibson and killed him and again repeated that he was driving the truck under the order of Chunk Woods, said he had made some prior trips with or for Chunk Woods in order to get liquor or gin and he also said that Carter never objected to these trips, though he refused to say positively or directly that Carter knew anything about them. He also testified that Chunk Woods would take the trucks and go anywhere he wanted to go without permission from Carter. He was asked definitely about getting gasoline in Missouri, as follows: "Now did you have to have specific orders about when to fill the car or just when you were near the state line? A. Just when we were up there. Q. Did Mr. Carter have a charge account there at the station? A. I generally as I went up would fill up and fill up as I came back and if I had the money I would pay for it and if I didn't I would have it charged to Mr. Carter."

Practically all of this testimony, except in regard to the purchase of gasoline in Missouri, was disputed by Carter by some of his witnesses. But, after the verdict of the jury, it may be said that Vickery's statement of it will be treated as the correct version. However, in con-

nection with the above detailed facts, the following may be considered. "Q. Now did Chunk tell you to get gasoline while you were up there at the line? A. No, sir. Q. You didn't go to the line for gasoline, did you? A. No, sir. Q. Did Russell Carter tell you to go to the line? A. No, sir. Q. Did Russell Carter know anything about your having the truck? A. I don't know whether he did or not." And another time he says, "Chunk sent me up there." Again, "Q. Did Russell Carter ever send you to the line after liquor? A. No, sir. Q. Did he tell you to make this trip? A. No, sir. Q. Well, when you went after this liquor, was that for you and Chunk? A. No, sir. Q. Who was it for? A. Chunk. Q. Now, there was nobody else had any interest in that liquor except Chunk? A. No, that is all I know of—he gave me the money. Q. You hadn't seen Carter most all the day, had you? A. No, sir." Again in regard to this examination, he testified as follows: "Q. State whether or not you know whether Mr. Carter had any interest in the liquor or whether you mean to say you don't know whether he had any interest in it. A. I don't know—I don't think he did. Q. Chunk gave you the money for the liquor, did he? A. Yes, sir. Q. As a matter of fact, do you know whether Mr. Carter had instructed him to get the liquor or whether Chunk himself originated the idea of the liquor? A. Chunk just gave me the $2 and told me to get it."

The foregoing is all the evidence offered as tending to show the reason for the trip from Mountain Home to the state line by Vickery at the time of the fatal accident. He went because ordered by Chunk Woods, whom he had been told to obey sometime before, but who had continued giving orders after the time or reason therefor had expired and this fact was most probably known by Carter, at least, it is as well established as some other of the facts upon which reliance is had for the right of a recovery. Under the evidence and in conformity with the verdict of the jury, we presume that Woods may be treated as an agent for Carter, having general authority, control or supervision over the business of the truck line, at least during such time as Carter was not himself present. It is argued seriously that Carter was present when

Woods gave the order to Vickery to make the trip after the gin, though Carter had not suggested anything in regard to the order, even if he had knowledge of it. Carter, himself, says that he was not present in the afternoon of that day, but was away from town looking after other business and did not return until late or after the time of the accident, hauling in another truck a load of cattle that afternoon. We fail to see, however, how it made a great deal of difference whether Carter was present or absent. The trip may not, under the testimony, be treated as one made for him or for his benefit, although it is argued from some of the evidence that Woods, when he had liquor, would treat or drink with some of his friends and that this was done as one of the advertising plans or schemes to get business for the truck line, although it is not contended that Carter had anything to do with this plan, or had any knowledge of it. Perhaps it was not necessary that it have his approval if Woods may be deemed as the general agent, having authority practically co-extensive with that of the master. The most that can be said in regard to this proposition is that the theory was a far-fetched one, so chimerical and remote that substantial rights could not be based or founded thereon.

It is also argued that, on account of the fact testified to by Vickery, he got ten gallons of gasoline while in Missouri, that the trip may have been deemed in part at least for the benefit of the truck line, but this argument is contradictory to Vickery's positive statement that the trip was not made for the purpose of getting gasoline, but to get the gin. It may be also said that Vickery denied that he had any interest in the gin, although he drank enough of it to be drunk. He testified that Carter had no interest in it and that it was all for the man who gave the order, Chunk Woods.

There is no contention that the trip after the gin was a part of the business of the truck line. It was not sent for, procured, or hauled as part of the freight handled, nor was there any profit which would accrue to Carter. There is no pretense that Vickery was serving Carter in any respect, except that he had been ordered to obey

Woods' commands and he was acting in obedience there-to rather than take the chance of losing his job.

The foregoing statements are the most favorable aspects or interpretation arising out of the evidence to support the judgment rendered in the circuit court.

The foregoing deductions and conclusions are the strongest that Vickery himself placed upon his own conduct even though he may have been prompted by a perverted sense of justice to right a wrong he had committed.

In entering upon a discussion of the law applicable to these facts, we think it may be said that there is no real controversy. The test is not whether the fatal accident occurred during the time or period of employment of Vickery by Carter. "The act of the servant for which the master is liable must pertain to something that is incident to the employment for which he is hired, and which it is his duty to perform, or be for the benefit of his master." *Sweeden* v. *Atkinson Imp. Co.*, 93 Ark. 397, 125 S. W. 439, 27 L. R. A., N. S. 124.

The announcement of this principle of the law has been made in cases involving similar facts. One of the most illuminating cases, after the Sweeden case, *supra,* is that of *Healey* v. *Cockrill,* 133 Ark. 327, 202 S. W. 229. In that case the servant had been directed by the master to take from a garage an automobile and bring it to the front of the residence. Instead of obeying this order, the servant drove a few blocks down town to a store to get a package of cigarettes and while on this trip the accident occurred. In regard thereto the court said: "And if the servant steps aside from the master's business to do an independent act of his own and not connected with his master's business, then the relation of master and servant is for such time, however short, suspended; and the servant, while thus acting for a purpose exclusively his own, is a stranger to his master, for whose acts he is not liable." . . . "If a servant completely turns aside from the master's business and pursues business entirely his own the master is not responsible." *Healey* v. *Cockrill, supra.* The elaborate discussion of Chief Justice McCulloch is conclusive here.

Another case of equal importance is that of *Hunter* v. *First State Bank of Morrilton,* 181 Ark. 907, 28 S. W. 2d 712. In the decision of that case the court cited the rule announced in *Healey* v. *Cockrill, supra,* and in *Bizzell* v. *Hamiter,* 168 Ark. 476, 270 S. W. 602, and *Keller* v. *White,* 173 Ark. 885, 293 S. W. 1017, in all of which announcements the same principle of law is adhered to with such faithfulness no controversy remains to justify further discussion.

So here it must be said at the time of the fatal accident in which Vickery killed Gibson, he was not acting for and on behalf of Carter or any way in the interest of Carter's business. According to his own statement, he was only acting in obedience to orders given him by Chunk Woods to go and procure gin, not for Carter, but for Woods, and even though Woods be deemed a general agent with full authority to give orders to Vickery, that agency, so far as Carter is concerned, must be deemed to have related to Carter's business, otherwise it was not an agency, and since it did not relate to Carter's business, the agency, did not exist. Therefore, Woods and Vickery were acting for themselves.

The following interesting authorities may be examined by any one who desires to pursue further investigation of the legal propositions involved: *American Ry. Express Co.* v. *Mackley,* 148 Ark. 227, 230 S. W. 598; *Hough* v. *Leech,* 187 Ark. 719, 62 S. W. 2d 14; *Pickens* v. *Westbrook,* 191 Ark. 156, 83 S. W. 2d 830.

Appellees present another novel theory and suggest that the case should be affirmed thereon. That is, that Vickery is irresponsible as a truck driver and that liability was fixed, by permitting him to take the truck and enter upon the highways where it might be expected he would do personal injury to someone, or destroy property. In answer to this unique suggestion, it may be said that, although pleadings may sometimes be deemed amended to conform to the proof, there was no suggestion of this in the trial court, there was no instruction given upon such a theory, there was no determination of any fact by the jury in regard thereto, there was no defense offered because no such charge was made, so a

complete answer to such suggestion is that no such case was tried in the circuit court and upon appeal we may try only such matters and issues as arose and were decided, or should have been determined in the circuit court.

This contention, therefore, is wholly without merit.

It is also suggested that since Carter was operating a truck line under a permit issued by the state, he must be deemed to have been secured against loss and that an affirmance of the judgment need not affect his financial status; that an affirmance of the judgment is required by good morals and modern progress in jurisprudence.

We cannot conceive that development and progress in the law means a wrecking and scrapping of judicial principles, established and fixed by the experience and development and growth of the race, so clearly stated and so long recognized as to be deemed a part and plan of natural justice and right among men that no dispute or controversy can arise concerning them. Growth and progress can be developed only by having regard for fixed principles and not by their destruction.

From the foregoing it does appear that the trial court erred in not directing a verdict for the defendant, and as the case has been fully developed no good purpose can be served in remanding the matter for a new trial.

The judgment is, therefore, reversed, and the cause dismissed.