ARKANSAS STATE HIGHWAY COMMISSION v.

W. D. DAVIS, ET AL

5-4692                                    434 S.W. 2d 605

Opinion Delivered December 16, 1968

*Thomas B. Keys and Virginia Tackett* for appellant.

*Graves & Graves* for appellees.

CARLETON HARRIS, Chief Justice.    This case involves a condemnation by the Arkansas State Highway Commission of 3.37 acres out of two tracts comprising 97 acres of land owned by appellees, W. D. Davis and wife, Vera Davis.    A Hempstead County jury found that appellees were entitled to compensation in the amount of $18,000, and from a judgment entered in that amount, appellant brings this appeal.    For reversal, two points are relied upon, which we proceed to discuss.

The principal item of damage contended for by appellees relates to the value of six commercial egg layer houses, located on land not taken, which appellees contend are now without value (except for salvage), because of the proximity of the new Interstate Highway No. 30. Evidence was offered on behalf of appellees that their contract with Corn Belt Hatcheries, under which contract they were furnished layers by the company, had been cancelled because of the construction. It is asserted by appellant that the evidence offered by appellee was speculative, and that no facts were shown which justified the award made. It is also contended that the Circuit Court erred in refusing to admit testimony about the sale of dirt by appellees to appellants' contractor, such dirt being taken from a strip of the condemned land, which was land-locked.

The evidence reflects that in 1958, appellees entered into a contract with Delight Egg Farms, owned by Corn Belt Hatcheries, to produce eggs for Delight. The layers were placed with the Davises, and the contract remained in force until May of 1967. To house the flock, six chicken houses were built, and these were valued by appraisers at the time of the taking as worth approximately $20,000.00. Wayne Russell, manager of Delight Egg Farms since April, 1957, testified that the company felt that it could not renew the contract after learning that the new highway would be constructed, and after making an investigation of how this would affect the Davis operation. He stated that he met with one of the highway officials who had a plat giving the approximate location of the highway, this plat showing the proximity of the laying houses to the interchange during construction and after. He said that the interstate highway was too close to these houses for the program (commercial layers) to be successful:

> "We made our decision based on the past knowledge that we have concerning what constitutes a good situation as far as our placing birds in

an environment that would at least give us an even break, or an even chance to come out. Our business, like Mr. Davis', is production, and our income off of our birds is eggs, and it's a mighty fine line between making profit and realize loss. And it's our considered opinion, and we exercised that opinion, by advising Mr. Davis that we would not place birds with him beyond the termination of the existing flock, and we have followed through on that decision by withdrawing our contract agreement with Mr. Davis.''

He testified that the layers were affected by noise and light, and that the lights of vehicles, as they left the Hope highway and turned onto the ramp leading to the interstate highway, would shine directly toward the poultry house. In explaining the effect upon the birds, Mr. Russell said:

''These birds are bred for high production, and when I say high production, I am talking in terms of a national average from the commercial egg industry, and is probably in the realm of 220 eggs per hen house. And our program is at least as good as the national average, I suspect. Being bred for such high production carries with it some characteristics, or traits, of the general breed of bird, not ours only but other birds—other breeds, as well, that makes them highly susceptible to conditions that we might consider to be normal, but yet to birds are highly abnormal. Sudden light, sudden noise, commotion, the activity around a poultry house is best held to a minimum. I believe I heard Mr. Davis testify that even a stranger coming into the poultry house could produce an adverse effect. This is true. I find it my responsibility to visit poultry farms that we are involved in, and from personal experience I know that even myself walking down through the poultry house, regardless of the style or type, produces the same reaction from the birds.

"They are extremely fractious type livestock, and they will seemingly try to take the roof off the building, and this activity, or excess activity, around the birds, or in the chicken house itself, is detrimental to production. It will almost always produce a drop in production, and if it were allowed to run rampant, it could certainly produce a disastrous experience as far as production is concerned."

He compared the difference between this highly bred strain of layers and the barnyard hen to the difference between a race horse and a plow horse. Davis indicated that cannibalism (whereby these birds use their beaks to pull feathers and eat themselves and other birds) is related to, or at least aggravated by, sudden noises and sudden lights. In his opinion the chicken houses were of no further value. The witness stated that the facility could not be used for heavy breeders, because there were not enough houses, and the houses were not large enough.

Russell said that Davis' operation had been satisfactory, though he indicated that, had the contract been continued, the company would have required some improvements in the layer houses. This was the only witness offered by Davis relative to the commercial layer project being destroyed by the building of the highway (thus making his houses worthless), and we think the evidence falls short of establishing this contention.

For instance, though stating that the lights would point directly at the houses, Mr. Russell did not go to the point where, in turning, vehicles would allegedly shine their lights toward the houses; he did not know the distance from the houses to this point, nor did he make any experiments with actual noise and light. He only reached his conclusions from a sketch which was not drawn to scale; in other words, he did not actually know for a fact that the lights would shine into the

chicken houses. There was also testimony by one of appellant's witnesses that there were obstructions between the ramp and the chicken houses that would prevent the lights hitting them; the main lanes and the referred to ramp of the interchange will be constructed at distances of 250 to 450 feet from the chicken houses. Mr. Russell's testimony loses much of its value when it is shown that he has no personal knowledge of the matters mentioned in this paragraph. Of course, there is no direct evidence that the hens stopped laying, since the last birds were moved from the farm in May, 1967, but neither is there specific evidence of losses suffered in other similar operations where layers were subjected to unusual noise and flashing lights.

It might also be mentioned, as far as noise is concerned, that the Hope-Nashville highway has run parallel to a part of this property for a long period of years, in some places as close as the ramp which leads to the interstate highway (and much closer than the interstate highway itself), and apparently the noise had no effect. We recognize that there is more travel on an interstate highway, but we think the fact that some of the houses have always been near to a well traveled highway has some pertinence.

There is no testimony that appellees tried to obtain a flock from some other company, or that the possibility of erecting artificial barriers to prevent light from shining into the houses was considered[1].

We think that, as the matter now stands, the evidence was too much based on conjecture and speculation; on the other hand, the evidence offered by appellant was not satisfactory on this point. Two appraisers testified for the Highway Department, one stating that he had farmed most of his life, and was familiar with the chicken

---

[1]The houses could not be moved because of their length: One measured 24 by 132 feet; one, 24 by 612 feet; two, 17 by 123 feet, and two houses (actually, one L-shaped) had a combined footage of 24 by 264.

industry from observation and talking to people in other areas. However, the witness had never raised chickens, except when he was in 4-H Club work. It would not appear that either of these witnesses could be classed as experts with regard to commercial layers, though the record does indicate that there were experts in the general area (so regarded by both sides) who were not called upon to testify.

For the reasons herein set out, the judgment will be reversed, and the cause remanded, which will afford an opportunity for the parties to present more positive and more explicit evidence relative to the issue of whether the Davises' commercial laying houses are now a total loss because of the proximity of the new interstate highway.

We think it well to pass upon appellant's second point, since this question might also arise in a retrial of the case.

The condemnation of a part of the land desired left 18 acres belonging to appellees south of the interstate completely severed from the main portion of appellees' lands, which are located north of the interstate. This 18 acres is "landlocked." Davis testified that this acreage was "pasture land," but it was of no use to him, because "there is no way I can get to it." Counsel for appellants closely examined Mr. Davis relative to any other use being made of this landlocked area, and the witness replied, "I don't know of any use. I don't know of anything I could use it for." After several questions were overruled, the court went into chambers for the purpose of making a record. At that time, Davis was asked if he had a contract with the Freeto Construction Company for the sale of dirt. He answered in the affirmative, and was then asked if the contract provided that Freeto would buy no less than 300,-000 cubic yards of dirt at a royalty of $.04 per cubic yard. Again, the reply was in the affirmative. An offer

of proof was made that a miminum of $12,000.00 income from this landlocked area would be received by this appellee, and further, that the contract was entered into approximately six months after the declaration of taking. The court held the evidence inadmissible, and it is argued that this ruling constituted error.

It is the contention of the department that the value of Davis' property was actually enhanced by the taking, for the reason that Freeto entered into this contract solely because of the close proximity of this 18 acres to the site where the highway was being constructed. We have held that where a public use for which a portion of a landowner's land is taken so enhances the value of the remainder as to make it of greater value than the whole before the taking, the owner has received just compensation for his property in benefits; also, we have held that the benefits which will be considered must be those which are local, peculiar, and special to the owner, i.e., benefits not enjoyed by the general public. *McMahan* v. *Carroll County,* 238 Ark. 812, 384 S.W. 2d 488. Though the amount received in the contract is not as great as the value of the entire acreage before the taking, it is argued that a special benefit to appellees was created by the condemnation which should have been considered by the jury. We disagree, for the special benefit referred to in our cases is the benefit accruing to the property owner from the completed highway, i.e., a benefit from the *Improvement.* Ark. Stat. Ann. § 76-521 (Repl. 1957); *Herndon* v. *Pulaski County,* 196 Ark. 284, 117 S.W. 2d 1051. Also, the value of the dirt on this 18 acres was not occasioned by the fact that a part of Davis' lands was condemned; if the condemned land had belonged to a third party (and Davis had only owned this 18 acres) the dirt would have been just as close to the site, and would have had just as much value for contract pur poses. The construction of the interstate highway is the circumstance that created the value. There may well be other landowners in the vicinity whose lands have not been condemned, but who also can sell dirt to the contractor because of the location of their properties.

In the court below, in seeking a new trial, appellant argued that this testimony was admissible as going to the credibility of Davis after the latter stated that he did not know of any use for the land. This particular point was not argued here for reversal, since it did not occur during the trial itself, though appellant's brief submitted to the trial court, at the time of filing his motion, is included in the abstract filed in this court. Had this reason for admitting the testimony been advanced to the court during the trial, it would have been admissible for that purpose, and should the same, or a similar situation, arise in a new trial, the sale of the dirt to the contractor is entirely pertinent as affecting the credibility of Davis.

Because, as set out under the first point, the evidence was conjectural and speculative, the judgment is reversed, and the cause remanded.

It is so ordered.

FOGLEMAN, J., concurs in part and dissents in part.

JOHN A. FOGLEMAN, Justice. I am persuaded that the reversal of the judgment in this case is required for want of substantial evidence to remove the determination of just compensation from the realm of speculation and conjecture as to the availability of the residual property for the poultry business theretofore conducted thereon.

I dissent, however, from that part of the court's opinion relating to the examination of W. D. Davis with reference to his contract for the sale of fill dirt. I agree that the testimony was not admissible to show special benefits to appellees as a result of the taking. The point on which appellant relies is:

"The Trial Court erred in refusing to admit testimony as to the sale of dirt by appellees to appellant's contractor."

Appellant relates an offer of proof of a contract between appellees and a contractor constructing a part of the highway for the sale of not less than 300,000 cubic yards of dirt at four cents per cubic yard, or $12,000, or more. The entire argument made here has to do with appellant's contention that the contract showed that special benefits accrued to appellees' residual lands by reason of the taking. Not one word of that argument has anything to do with the credibility of W. D. Davis or the weight to be given to his testimony. Matters not argued here are deemed waived. *Gordon* v. *Street Imp. Dist. No. 1 of Gillett*, 242 Ark. 599, 414 S.W. 2d 628.

In spite of this, the majority undertake to justify the admission of the rejected evidence. Nothing whatever was said by Mr. Davis on direct examination about the value of his land, either before or after the taking. Furthermore, nothing was said by him, on direct examination, about the use to which his remaining land could be put. He did say that it could not be used in the poultry business. The matter appellant sought to inject had nothing whatever to do with impeachment of Mr. Davis or with his credibility or the weight to be given to his testimony. On cross-examination, Davis did respond that he could not get to the 18-acre tract south of the highway. Appellant started to ask Davis if he had not used the land for purposes other than pasture, when the trial court sustained an objection by appellees' attorney for immateriality. Appellant's attorney argued then, as now, that the testimony went to the enhancement of the property. Appellees' attorney stated that there was no contention that this property was damaged in any manner other than by being severed. Later, appellant's attorney, not appellees', asked Davis his opinion as to the highest and best use of the land after the taking. He stated that since poultry raising was cut out, and the remainder not large enough for a cattle operation, he did not know. In response to a later question as to what he considered to be the highest

and best use of the 18-acre tract after the taking, Davis replied that he could not get to it and it was landlocked.

In making an offer of proof for the record, appellant sought to prove the above mentioned contract entered into some six months after the taking. The court again refused to admit the testimony. Not a word was said by anyone about impeachment, credibility, or weight to be given the testimony. Appellant's attorney flatly stated that the offer was made simply to place "in the record the amount of profits he has gotten off of dirt off that same portion of land." Appellant argued in the lower court, as it does here, that testimony of this nature is admissible by authority of *City of Little Rock* v. *Moreland*, 231 Ark. 996, 334 S.W. 2d 229. However, that case has nothing to do with impeachment, credibility, or weight to be given to an owner's testimony.

The arguments made by appellant are not even suggestive of the propriety of admission of the evidence for the limited purpose stated in the majority opinion or to any limitation of that consideration by admonition to the jury. Be that as it may, points not properly raised in the court below cannot be considered here. *Widmer* v. *Ft. Smith Vehicle & Mach. Co.*, 244 Ark. 971, 429 S.W. 2d 63; *Greiner Mtr. Co.* v. *Sumpter*, 244 Ark. 736, 427 S.W. 2d 8; *Insured Lloyds* v. *Mayo*, 244 Ark. 802, 427 S.W. 2d 164; *Ingle* v. *Marked Tree Equip. Co.*, 244 Ark. 1166, 428 S.W. 2d 286. This rule prohibits consideration of the impropriety of a court's action upon grounds other than those stated in a specific objection made by an appellant. *Industrial Farm Home Gas Co.* v. *Mc-Donald*, 234 Ark. 744, 355 S.W. 2d 174. The specific objection made by appellant waived all other objections. *Woods* v. *Pearce*, 230 Ark. 859, 327 S.W. 2d 377; *Wagnon* v. *Barker*, 236 Ark. 55, 364 S.W. 2d 314. The basis for admission of the testimony upon which the majority relies, not having been asserted at trial, should be unavailing here. *Missouri St. Life Ins. Co.* v. *Fodrea*,

185 Ark. 155, 46 S.W. 2d 638. Any other rule is unfair to the trial court, which has never been presented with the issue or given a chance to rule upon it. This is an appellate court and the issues we can raise are limited largely to questions of jurisdiction, or to matters which support the action of the trial court.

I have been unable to determine how the majority ever reach this point. It seems odd indeed to say that testimony elicited by appellant from its adversary on matters not covered on direct examination opens the gate to it to bring otherwise inadmissible and prejudicial testimony through the back way. This statement of the matter seems to me to be quite unfair to appellees, who have never had an opportunity to meet this argument either in the trial court or here. Appellees' attorney might well have argued that the trial court should exercise its discretion to limit the cross-examination of the owner so as to exclude the matters appellant sought to show. See, 5 Nichols on Eminent Domain, 3d Ed., 277, S. 18, 45 [2]. This might result in exclusion of the price to have been paid for the dirt to be sold from the land, or of the quantity to be sold, or of all facts pertaining to the contract. Conceivably, there would be other arguments which do not come to mind upon abstract consideration, but which would readily occur to an able advocate faced with the question. It is significant to me that the majority were unable to (or at least did not) cite a single authority for its ruling on this point.

A motion for new trial should not be made a vehicle for decision of questions not properly presented during the trial. It has long been the rule in this state that objections not made in the course of the trial cannot be set out for the first time in a motion for new trial. *Mills* v. *Robertson*, 201 Ark. 170, 144 S.W. 2d 731; *Haley* v. *Brewer*, 220 Ark. 637, 249 S.W. 2d 128.

I am aware of, and subscribe to, this court's practice of deciding questions which might arise upon a retrial ordered on reversal, *when that question is properly* before the court. I consider the decision of questions either not properly raised in the court below or presented here, as well as those which have been waived by an appellant, to be highly improper. The practice of searching out and deciding all questions which might be said to be presented in a record was long ago rejected by this court in favor of decisions only upon those questions upon which a decision is invoked. *Western Clay Drainage Dist.* v. *Day,* 138 Ark. 181, 210 S.W. 338. See, also, *Bradley County Road Imp. Districts Nos.* 1 & 2 v. *Jarratt,* 144 Ark. 260, 222 S.W. 14. Upon appeal we can consider *only* those issues which arose and were decided by the trial court. *Carter Truck Line* v. *Gibson,* 195 Ark. 994, 115 S.W. 2d 270. Actually, as an appellate court, we have no jurisdiction to decide questions not decided by the trial court. *Sauve* v. *Ingram,* 200 Ark. 1181, 143 S.W. 2d 541.

Even if the point were properly before us, I would not reverse because of it. The circuit court and this court both have held that the evidence was inadmissible to show special benefits. Appellant was quite candid with both the trial court and this one in taking the position that evidence of these "profits" would be taken to show an enhancement in value of the property after the taking. Whether or not offered testimony was admissible as going to the credibility of Davis or the weight to be given to his testimony (which I do not concede), its value for that purpose is so insignificant that it should be excluded because the danger of the jury's misuse for the incompetent purpose is apparently great. McCormick, Evidence, 136, § 59; *Shepard* v. *United States,* 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 2d 196; *Southwestern Publishing Co.* v. *Horsey,* 230 F. 2d 319 (9th Cir. 1956); *State* v. *Schleigh,* 310 P. 2d 341 (Ore. 1957); 29 Am. Jur. 2d 310, Evidence, § 262.

I respectfully submit that this question should be reserved until it has arisen, been decided by a trial court, and presented in a manner which affords the advocate for the party against whom the rule would be applied an opportunity to present arguments from the perspective of his client.